**IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE**

DANIEL RICHMOND,

     Plaintiff/Appellant,

v.                               Case No. M2014-02461-COA-R3-CV

VANGUARD HEALTHCARE SERVICES, LLC
AND GLEN OAKS HEALTH AND REHABILITATION

     Defendants/Appellees.

**DANIEL RICHMOND'S RESPECTFUL APPLICATION FOR
PERMISSION TO APPEAL**

**THE WINFREY FIRM**
Brian C. Winfrey (TN Bar No. 025766)
Green Hills Office Park
2002 Richard Jones Rd. B-200
Nashville, TN 37215

Attorney for Appellant

1

# I.     STATEMENT OF THE FACTS

This case involves far more than just a violation of Tennessee's whistleblower laws. The fundamental subject of this case concerns the protection of the health, safety, and welfare of the elderly citizens of Tennessee. The central question in this case is whether Tennessee will continue to honor its longstanding laws and public policies that were created to protect the elderly from harm by requiring the reporting of suspected cases of abuse or neglect. Tenn. Code Ann. § 71-6-101.

Plaintiff Daniel Richmond was a Nursing Home Administrator who properly complied with the requests of a resident's son who presented Richmond with evidence of elder neglect. In doing so, Richmond also complied with company policy, public policy, and Tennessee law by reporting and investigating what he reasonably believed to be a substantive a complaint of elder neglect. Two days later, Richmond lost his job for making the report. (R. 1-6; R. 589-90). The material facts in this case are largely undisputed and set forth below.

## I.     Vanguard is in business to provide care and protection for elderly Tennesseans.

Vanguard Healthcare provides assisted living, rehabilitation, and restorative nursing services to elderly individuals for a profit. Vanguard owns, operates, and provides the operational policies and procedures for a significant number of nursing home and assisted living facilities in Tennessee, including Glen Oaks. (R.1; R.7). Up to one hundred twenty (120) elderly Tennesseans reside at Glen Oaks at any one time. Glen Oaks is located in Shelbyville, Tennessee. (R.1; R.7).

2

Case 3:16-bk-03296    Doc 462-1    Filed 09/05/16    Entered 09/05/16 20:51:54    Desc
Exhibit Supreme Court Documents and Complaint    Page 2 of 56

## II.  Vanguard hires Daniel Richmond to run Glen Oaks in 2012.

In 2012, Vanguard hired Daniel Richmond as its Nursing Home Administrator for Glen Oaks. (R.2; R.8). As Nursing Home Administrator, Mr. Richmond was the highest ranking on-site employee at Glen Oaks. (R.2; R.8). Mr. Richmond's job was to oversee the day-to-day facility operation and review organizational performance. (R.2; R.8). One of his primary job duties was "overseeing that residents receive care in a manner and in an environment that maintains or enhances their quality of life without abridging the safety and rights of other residents." (R.2; R.8). Another primary job duty was "overseeing that resident complaints and grievances are reviewed in a timely manner." (R.2; R.8).

## III. Vanguard policy demands that Mr. Richmond investigate all allegations, observations, or suspicions of elder abuse or neglect.

Vanguard maintains an Abuse Prevention and Event Management Policy ("Abuse Prevention Policy"). (R.3; R.796-908). The policy states that "*all* alleged violations of mistreatment, abuse, or neglect will be thoroughly investigated by the facility under the direction of the Administrator." (R. 805-806). The Administrator must complete the investigation within 48 to 72 hours. (R. 806). The policy defines neglect as "the failure to fulfill a caretaking obligation." (R. 803).

## IV.  Vanguard makes Mr. Richmond responsible for facility compliance with federal and state laws, including the Tennessee Adult Protection Act (TAPA).

Another job responsibility of Mr. Richmond as an Administrator was "ensuring that policies and procedures are developed, implemented, monitored, and evaluated in order to maintain compliance with federal, state, and local rules and regulations." (R.2; R.8; R.521). Vanguard's written policy stated that "all alleged violations involving mistreatment, abuse or

neglect will be thoroughly investigated by the facility under the direction of the Administrator and in accordance with state and federal law." (R.806).

Richmond was trained on state laws related to abuse and neglect, including the Tennessee Adult Protection Act ("TAPA"). The TAPA's expressly stated purpose is to protect adults from "abuse, neglect or exploitation by <u>requiring reporting of suspected cases</u> by any person having cause to believe that such cases exist." Tenn. Code Ann. § 101 (underline added). Section § 71-6-103(b)(1) of the TAPA creates the following mandatory duty to report suspected cases of abuse or neglect as it is drafted:

> "Any person, including, but not limited to, a physician, nurse, social worker, department personnel, coroner, medical examiner, alternate care facility employee, or caretaker, having <u>reasonable cause to suspect</u> that an adult has suffered abuse, neglect, or exploitation, shall report or cause reports to be made in accordance with this part."

Tenn. Code Ann. § 103(b)(1) (underline added). Section § 71-6-105 provides that "any person making a report under this part … shall be presumed to be acting in good faith." However, a person who fails to make a report required by statute has committed a Class A misdemeanor. Tenn. Code Ann. §§ 71-6-110, 71-6-105.

## V. Willar Grace Harris is a resident at Glen Oaks who is entitled to protection and care by Defendant. Richard Sanders is Ms. Harris' son and he is active in her life and care.

Willar Grace Harris is an elderly Glen Oaks resident in her late-eighties. (R.3; R.570). Ms. Harris could not care for herself due to several health impairments. (R.570-572). Her health impairments included dementia and multiple wounds in both her feet and ankle areas. Ms. Harris' feet and ankle impairments are "not minor health issues." (R.570 at ¶ 3; R.752). She required regular and comprehensive care and daily monitoring, including regular trips to a wound clinic for specialized care. (*Id*.). Ms. Harris' bandages needed to be frequently checked, covered,

4

replaced, and dated to minimize the risk of harm. (R.570). Doctors demanded that her socks be completely removed in order to assess the entire at-risk area for redness, swelling, and infection. (R. 570 at ¶ 13).

Ms. Harris' son is named Richard Sanders. (R. 570). Mr. Sanders was very active in his mother's life at Glen Oaks, regularly visiting her several times per week. (R. 630). Mr. Sanders often escorted his mother to her wound clinic treatments. (R.3; R.570).

### VI. Richard Sanders makes a multitude of grievances about his mother's clinical care and well-being at Glen Oaks.

Mr. Sanders filed several grievances about finding his mother wet, dirty, or having other related issues at Glen Oaks during Marybeth Bayman's tenure as Director of Nursing. (R.3; R.9; R. 570-72; R.573-580). In the month preceding September 4, 2013, Sanders filed grievances on the following dates:

- August 7, 2013 (transportation to wound clinic issues);
- August 17, 2013 (mother was dirty);
- August 24, 2013 (mother found dirty); and
- September 4, 2013 (bloody and outdated bandage affixed to foot of mother)

(R. 573-580). As a result of his grievances, Bayman was assigned specific daily monitoring and care duties for Ms. Harris to assure her health, safety, and welfare in August 2013. In explaining Bayman's caretaking obligations, Mr. Sanders stated: "[T]he person responsible for monitoring my mother's conditions (Ms. Bayman) *should have removed the sock completely* and made a detailed assessment of the bandages on her ankles and foot area … this is the level of care required in order to keep my mother from risk. This level of care was necessary under the doctor's orders." (R. 571 at ¶ 13) (emphasis added). Sanders affirmed that Bayman had been "instructed" to provide this level of care to Ms. Harris. (R. 631, p. 31-32). In Late-August 2013, Sanders complained again

5

about finding his mother soiled to Vanguard Corporate Representative Cynthia Burleson. (R. 586). As a result, Burleson directed both Richmond and Bayman to "get more aggressive" with addressing the concerns and complaints of Mr. Sanders on or around August 30, 2013. (R. 586).

### VII. Ms. Bayman is a poorly performing employee in the midst of a storm of poor performance.

Overall, Bayman was a poorly performing employee. Her poor performance and unprofessional behavior in just the six weeks preceding September 4, 2013 is well-documented:

- **July 26, 2013**: Richmond issued Bayman a Performance Correction Notice for (1) Policy/Procedure Violations; (2) Performance Issues; and (3) Behavior/Conduct Infractions. (R.592-594; R.435);

- **August 13, 2013:** Richmond, with Corporate involvement from Burleson, placed Bayman on a Performance Improvement Plan for multiple issues of poor performance, emphasizing areas of needed performance improvement. (R.435-436; R.595-598).

- **August 14, 2013:** Employee Haley Milliken submitted to Richmond a Complaint/Written Grievance about Ms. Bayman's unprofessional acts that were "not conducive to a healthy workplace atmosphere." (R. 600).

- **August 15, 2013**: Employee Janene Cooper submitted to Richmond a Complaint/Written Grievance about Bayman's unprofessional behavior and derogatory statements to staff. (R. 599).

- **August 15, 2013**: Richmond delivered a lengthy email to Corporate Management about a multitude of issues related to Ms. Bayman's unprofessional actions and poor performance. (R.601-602).

- **August 22, 2013:** Richmond recommended Bayman for termination. (R.603) ("the only prudent choice is to move forward with termination").

6

**VIII. On September 4, 2013, a "nasty and bloody" bandage dated "8/11/2013" is found stuck to Ms. Harris' skin, which Bayman admits can quickly result in discoloration, breakdown, and alterations of the skin.**

On September 4, 2013, Ms. Harris was escorted to the wound clinic by Mr. Sanders. (R.570-572). Wound clinic staff placed Ms. Harris in a chair, took off her shoes, then removed both of her socks to assess the entire at-risk areas. (R. 635, p. 26). Wound clinic staff found stuck firmly to Ms. Harris' skin a three-and-one-half-weeks old soiled bandage dated "8/11/13." (*Id.*).

The physical appearance of the soiled bandage was described and observed as "nasty" and "bloody." (R. 570-572; R. 568-569; R. 636, p. 28-30). Clinic staff placed the old soiled bandage in a biohazard bag for contaminated materials. (R.570; R.636; R. 97). The presence of the soiled bandage on Ms. Harris' skin put her in harm's way, as Bayman admits that an old soiled bandage affixed to her skin, even if in an area away from a wound, is potentially hazardous because it can lead to alterations of the skin, breakdown, and discoloration of the skin within an hour or two. (R. 769).

**IX. Richard Sanders returns to Glen Oaks irate and intent on filing a complaint of elder neglect against Bayman for a "bunch of reasons."**

Richard Sanders returned to Glen Oaks after the Wound Clinic visit on September 4, 2013. (R.570-572; R.756-757; R.3; R.9). He was irate. (R. 638, p. 36). He was both visibly and vocally angry. He confronted Bayman with the biohazard bag. (R. 637, p. 31-32). With his voice raised, Sanders told Bayman, "This was stuck to the bottom of my mother's foot when I got to the wound clinic ..." (R.637, p. 31-32). Sanders continued by yelling, "Marybeth, the bandage was on her foot, but you did not take her sock off to check her right foot as you had been instructed …" After Bayman admitted, "No, I didn't take the sock off," Sanders fired back with, "If you had took the sock off you would have seen this stuck to the bottom of the foot …" (*Id.*). Sanders told Bayman,

7

"That upsets me and I think that's wrong. I don't think you're taking care of my mother. I'm going to Daniel [Richmond] with it." (*Id*. at 31-32); (R.3; R.9; R.570-572).

Sanders and Bayman immediately went to Mr. Richmond's office for a meeting. (R. 94). Still visibly and vocally angry, Sanders insisted on making a formal neglect complaint against Bayman. (R. 570-572). Sanders stated to Richmond, "This is nothing but pure neglect." (R. 638). Bayman responded to the allegation by admitting, "I neglected to do a thorough examination of her foot."[1] (R. 98, p. 96).

Richmond calmly explained the definition of neglect to Sanders as a "failure to give appropriate nursing care." (R. 571 at ¶ 14). He calmly explained the consequences of a formal allegation of neglect, which he told Sanders could result in a report to the State. (R. 571 at ¶ 14). Sanders then threatened to personally report the incident to the State if Richmond did not do so. (R. 98, p. 95). Sanders further threatened that Vanguard "would be hearing from his attorneys" if no action was taken regarding his neglect complaint against Bayman. (R.94; R.103, p. 113; R. 98, p. 95). Richmond's effort to deescalate Sanders' anger was unavailing. Sanders continued to insist on making a formal neglect complaint against Bayman. (R. 571 ¶ 14).

---

[1]Bayman admits that she "neglected to do a thorough examination of her foot" at the meeting. The majority infers that, "Ms. Bayman explained that it was not necessary to fully remove the sock to examine, dress and bandage the wound on Ms. Harris' ankle; instead, she would pull the sock down far enough to determine that the ankle was appropriately dressed and bandaged." (Opinion at p. 2). The record does not support this conclusion, and is disputed by her admission in the meeting.

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 8 of 56

**X. Richmond interviews Sanders under company protocol about the nature of his neglect complaint, then reports his suspicions and belief of neglect.**

Richmond had the following mandatory job duties as a Nursing Home Administrator for Vanguard:

> "When the Administrator receives an allegation of abuse and/or neglect or exploitation, an internal investigation shall immediately commence. The Administrator will place the employee/alleged perpetrator on Administrative Leave."

(R. 533).

Vanguard investigation protocol includes the following steps, *inter alia*: (a) an Incident Report and interview of the complaining party must be taken immediately; (b) any employee suspected of abuse, neglect or mistreatment *must* be suspended as soon as the incident arises pending conclusion of the investigation; and (c) notification to the State Health Department must be made. (R. 805-811).

Around 11:30 a.m. on September 4, 2013, Richmond asked Bayman to exit the room and take her lunch break so he could interview Mr. Sanders for the Incident Report. (Id.) (R. 568-569). Sanders affirmed that Richmond did not suspend Bayman in his presence. (R. 571 ¶ 16). He further affirmed that Richmond remained calm and professional the entire time. (R. 570).

During the interview, Sanders told Richmond that the issues related to his mother's care have been a recurring problem under Bayman. (R. 641; R. 568-569). Sanders explained the scope of the neglect complaint by saying, "I was fed up with the way Mary Beth was taking care of my mother … It's not just one reason, it's a bunch of reasons. I didn't feel like my mother was getting proper care and just felt like it was negligence." (R. 641, p.50). Sanders spoke to Richmond about several prior incidents where he had found his mother dirty, wet, or with other related issues in May, July, and August 2013. (R. 568 R. 570 at ¶ 7). He told Richmond about his conversations

with Cynthia Burleson throughout August 2013. (R. 568-569). Sanders discussed the action plan that was implemented for his mother's care and monitoring as a result of his August discussions with Burleson. (*Id*.). While discussing his mother's monitoring at the interview, Sanders stated:

> "It should be done by the nurse, looking at wounds, skin & condition of [the] body. If they have a sore or bandage, it should not be wet, but dry, and also the area of the wound should be checked for redness and swelling. That should be done by a regular nurse, but if she [Bayman] had looked at her foot as a whole, not just dressing and a date, that would be what I'd consider monitoring. Daniel, I don't want my mother having bacteria on her."

(R. 569, 571). Based on all information known to Richmond at the time, he "fully agreed" that it appeared Bayman did not meet her caretaking obligations under doctor's orders and the action plan – which is even more plausible knowing Bayman's run of poor performance and the history of prior grievances about this resident. (R. 94, p. 80; R. 106, p. 126). Richmond believed the presence of the old soiled bandage was a part of a larger issue of neglect regarding Ms. Harris. (*Id*.).

Corporate representative Cynthia Burleson arrived at Glen Oaks by early afternoon on September 4, 2013. A second meeting took place. This meeting included Burleson, Bayman, Sanders and his wife, and Richmond. Burleson minimalized the complaint of Sanders, and tried to persuade Sanders that his concerns were invalid. (R.571-572, ¶ 20; R. 644-645). Sanders disagreed with Burleson and continued to insist on making a formal complaint of neglect against Bayman. (R. 571-572 ¶ 20). Richmond perceived Burleson's actions as an effort to cover up the allegation of neglect and avoid investigating the matter as required by law and company policy. (R. 102, p. 112). Richmond did not give Sanders a copy of the Incident Report during their earlier one-on-one meeting, but Burleson directed Richmond to give Sanders a copy of the Incident Report during this later meeting. (R. 571-572 ¶ 21). The investigation was launched after the meeting. (R. 106).

Richmond reported the suspected neglect to Corporate Compliance Officer Arlene Moore. (R. 106, 126). He solicited Moore for guidance to determine whether he was taking the proper steps under protocol, as he "felt neglect was involved." (R. 106, p. 126). Arlene Moore confirmed that Richmond was following the right steps under the circumstances. (R. 106).

### XI. Vanguard responds to Mr. Richmond's report and investigation of the complaint of neglect by Sanders with hostility and disdain.

Immediate hostility was directed at Richmond by Vanguard agents for his refusing to remain silent, participate in a cover up, and ignore Sanders' complaint of comprehensive neglect. (R.4-5; R.74-155). In fact, after Richmond reported and investigated the complaint, corporate representatives exchanged an email that made false statements about Richmond's actions and admitted Vanguard's primary concern: "Overall, [Mr. Richmond's actions] 'just increased our risk …'" (R.589-590).

The investigation did not yield a definitive finding about whether or not the incident was a result of neglect or part of a larger problem of neglect. (R. 95) (R.765). However, the investigation did uncover evidence that Ms. Harris was not being provided clean socks, which could also be a cause of the old soiled bandage being affixed to her skin. (R.590) (Dissention Opinion at p. 4, f.n. 3). There is nothing in the investigation or record reflecting Ms. Harris' bathing or cleaning schedule. (Dissenting Opinion p. 3). The investigation did not yield a conclusive finding about whether the old bloody bandage being stuck to Ms. Harris' foot was the result of leaving the bandage in a sock; reusing dirty socks on Ms. Harris without washing them; failing to perform sufficient monitoring; or any other possible cause. Multiple possibilities exist about the cause of the old bandage being stuck to her skin, including neglect by Marybeth Bayman in the form of (1) insufficient monitoring or (2) reuse of dirty unwashed socks containing old bloody bandages on Ms. Harris. Richmond was fired before he could complete the investigation. (R. 95, p. 84).

11

**XII. Richmond is fired for "initiating an investigation"; not sticking up for the accused nurse in the face of a complaint; and letting a family member decide what constitutes neglect.**

Two days after he had reported suspected neglect and initiated an investigation, Vanguard discharged Mr. Richmond on Friday, September 6, 2013. (R.567). Mark Miller, Richmond's supervisor, told him that he was fired for: (1) letting a family member dictate what neglect is; (2) failing to stick up for the individual accused of neglect in the face of an allegation; and (3) initiating an investigation into neglect. (R.109, p. 137-139); R. 4-5). Miller stated that it was not Richmond's job to protect the resident, Ms. Harris, but that, instead, it was his job to protect the Director of Nursing, Bayman. (R.109). Mr. Richmond brought this retaliatory discharge from employment action under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, and Tennessee common law. (R.1-6).

## II.    QUESTIONS PRESENTED FOR REVIEW

1.  Whether the majority's holding that Tenn. Code Ann. § 71-6-103(b)(1) "does not require the reporting of an act or omission that does not violate a clear public policy or statutory or regulatory provision" is inconsistent with and fundamentally alters Tennessee's adult protection laws where the language of the statute imposes a mandatory duty to report on "[a]ny person . . . having reasonable cause to *suspect*" abuse or neglect?

2.  Whether the majority's interpretation of Tenn. Code Ann. § 71-6-103(b)(1) can be reconciled with the TAPA's stated legislative purpose of protecting adults from abuse and neglect "by requiring reporting of *suspected* cases by any person having cause to believe that such cases exist?" Tenn. Code Ann. § 71-6-101.

3.  Whether employees who act pursuant to a mandatory duty to report under law are protected from retaliatory discharge under the TPPA and common law?

4.  Whether the majority incorrectly imposed a "formidable burden" on Mr. Richmond that is inconsistent and conflicts with this Court's and the United States Supreme Court's holdings that a plaintiff's *prima facie* burden in a retaliatory discharge case "is not onerous" and "is easily met"?

5.  Whether the majority opinion should be reversed where summary judgment was granted using a narrow and incomplete view of the facts to conclude that Mr. Richmond lacked reasonable cause to suspect that neglect had occurred where the full set of facts and circumstances properly construed in the light most favorable to Mr. Richmond would easily allow a reasonable jury to conclude that he had reasonable cause to believe that an elderly resident had been neglected at some point in her care, as Judge Stafford concluded in his dissenting opinion?

13

## III. DATE OF ENTRY OF JUDGMENT

Plaintiff – Appellant Daniel Richmond respectfully submits this Application for Permission to Appeal the judgment of the Court of Appeals entered on January 29, 2016 in *Daniel Richmond v. Vanguard Healthcare Services, LLC*, No. M2014-02461-COA-R3-CV (Tenn. Ct. App. Jan. 29, 2016) (Copy attached).

## IV. RULE 11 STATEMENT

This Court should grant Mr. Richmond's Application for Permission to Appeal and reverse the judgment of the Court of Appeals (1) to secure uniformity of decision, (2) to secure settlement of important questions of law, (3) to secure settlement of questions of public interest, and (4) because there is a need for the Court to exercise its supervisory authority.

### A. The Need to Secure Uniformity of Decision

1. <u>The majority's interpretation of the TAPA's duty to report cannot be reconciled with the purpose of the TAPA; the plain language of its duty to report; or parallel interpretations of similar laws created for similar purposes – including child abuse and neglect laws.</u>

The language of Section 71-6-103(b)(1) is unambiguous. The majority's opinion significantly misinterprets the duty to report suspected cases of abuse or neglect by holding that "the statute does not require the reporting of an act or omission that does not violate a clear public policy or statutory or regulatory provision." (Opinion at p. 14). This holding cannot be reconciled with the TAPA's purpose, plain language, or parallel interpretations of similar duties to report under similar laws intended to protect individuals, including Tennessee's child abuse and neglect laws.

Legislative intent must be ascertained by applying the natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of

14

the language. *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000). Courts must presume "that a legislature says in the statute what it means and means in a statute what it says there." *Anderson v. Outland*, 210 Tenn. 526, 360 S.W.2d 44 (Tenn. 1962).

This Court recognizes that "the starting point for interpreting a statute is the language of the statute itself." *Culbreth v. First State Bank Nat'l Ass'n*, 44 S.W.3d 518, 524 (Tenn. 2001). Section 71-6-101 states the General Assembly's legislative purpose for the TAPA as: "[T]o protect adults coming within this part from abuse, neglect, or exploitation *by requiring reporting of suspected cases* by any person having cause to believe that such cases exist." Tenn. Code. Ann. § 71-6-101 (emphasis added). This legislative purpose is furthered by the inclusion of § 71-6-103(b)(1), which reads:

> Any person, including, but not limited to, a physician, nurse, social worker, department personnel, coroner, medical examiner, alternate care facility employee, or caretaker, *having reasonable cause to suspect* that an adult has suffered abuse, neglect, or exploitation, *shall report or cause reports to be made* in accordance with this part.

Tenn. Code Ann. § 71-6-103(b)(1) (emphasis added).

"Suspect" is defined as: "To have a slight or even vague idea concerning – not necessarily involving knowledge or belief or likelihood." *Black's Law Dictionary* 1446 (6th ed. 1990). "Suspicion" is defined as: "The act of suspecting, or the state of being suspected; imagination, generally of something ill; distrust; mistrust; doubt. The apprehension of something without proof or upon slight evidence. Suspicion implies a belief or opinion based upon facts or circumstances which do not amount to proof." *Id*. at 1447. "Reasonable cause to suspect" is a standard courts understand as "ultimately involving a belief, based on evidence but short of proof." *State v. Hurd*, 135 Wis.2d 266, 274 (Wis. Ct. App. 1986). The "shall report" language in the TAPA makes the duty to report "suspected" cases of abuse or neglect mandatory. *Austin v. Auston*, 1994 Tenn. App.

15

LEXIS 363 (Tenn. Ct. App. 1994) (holding that "shall" is a directive with the force of the word "must" and is mandatory in nature).[2]

Mr. Richmond's role as a Nursing Home Administrator, the complaints that he received, and the facts and circumstances that he knew about implicated his duty to report under the TAPA. (Dissenting Opinion at p. 4). As Judge Stafford recognized in his dissenting opinion, "in this case, the impetus to report wrongdoing is more than a mere moral imperative, it is a statutory directive." (Dissenting Opinion at p. 4). Mr. Richmond's duty to report was triggered by "reasonable cause to suspect," and this duty was not contingent upon a later determination of the actual illegality of the reported activity. Ignoring the complaint of neglect and refusing to initiate an investigation would have demanded that Mr. Richmond violate the TAPA and expose himself and the defendant to criminal liability. Tenn. Code Ann. § 71-6-110. Such a dilemma is contrary to the intent and purpose of Tennessee's whistleblower protection laws. *Williams v. City of Burns*, 465 S.W.3d 96 (Tenn. 2015) (recognizing that "an employee should not be placed in the moral, ethical, and legal dilemma of being forced to choose between reporting or participating in illegal activities and keeping his job").

Similarly, suspicion short of proof is the trigger point of a mandatory reporting duty under similar Tennessee laws created to protect a vulnerable populous. For example, child protection laws impose a mandatory duty to report that is triggered when a person with a duty suspects abuse or neglect short of absolute proof. *Doe v. Coffee County Bd. Of Educ*,852 S.W.2d 899 (Tenn. Ct. App. 1992) (holding that teachers have a non-discretionary duty to report child abuse complaints

---

[2] The intent of the General Assembly to give the TAPA enforcement teeth is evident. A person who fails to make a report required by statute has committed a Class A misdemeanor, and a person who reports a suspected case is granted immunity and presumed to have acted in good faith. Tenn. Code Ann. §§ 71-6-110, 71-6-105.

short of proving that the child was abused); *Ham v. Hospital*, 917 F. Supp. 531 (E.D. Tenn. 1995) (holding that a doctor's failure to report suspicious injuries indicating child abuse can give rise to liability); *Draper v. Westerfield*, 2004 Tenn. App. LEXIS 486, *10 (Tenn. Ct. App. 2004) (same). And while individuals who fail to report suspected cases of child abuse or neglect are exposed to legal liability, those who report their suspicions gain immunity. *Id.*[3] Provisions of the TAPA and the child protection laws should be construed *in pari materia*, as both are "designed to protect persons who are under the care of another or who are otherwise unable to care for themselves." *State v. Adams*, 24 S.W.3d 289, 296 (observing that "statutes relating to the same subject or sharing a common purpose are to be interpreted in a manner that advances their common purpose or intent").

The majority of the Court of Appeals' holding in this case narrows the duty to report from suspected cases to actual statutory violations. (Opinion at p. 14) (holding that "[t]he statute does not require the reporting of an act or omission that does not violate . . . ."). Despite its power and ability to do so, the General Assembly did not draft Section 71-6-103(b)(1) to read, "Any person knowing of an actual violation of abuse or neglect laws shall report or cause reports to be made" or the like. The language used by the legislature references a suspicion, not an actual violation, and courts must presume that the language used was intentional and manifested the will of the legislature. Here, the majority's interpretation strays significantly from the intent of the General Assembly. A court "must not ignore the natural and ordinary meaning of statutory language and

---

[3] If an employee reporting a suspected case of abuse or neglect is immune from legal liability, it logically follows that the law affords him protection from retaliatory discharge for doing so. The TAPA includes a provision protecting employees from detrimental changes in employment for reporting suspected cases of abuse or neglect. T.C.A 71-6-105. Section 71-6-105 also provides that "any person making a report under this part … shall be presumed to be acting in good faith."

then impose its own idea of legislative intent." *Wilson v. Johnson C*o., 1993 Tenn. App. LEXIS 460, *9-10 (Tenn. Ct. App. 1993).

For these reasons, Mr. Richmond requests that the Court grant his Application and reverse the judgment of the Court of Appeals to secure uniformity of decision. There is no legal or logical reason to discriminate between the protections afforded to children versus adults who are unable to care for themselves. The General Assembly's intent to err on the side of caution by requiring caretakers and others to exercise an ounce of precaution to provide a pound of protection for Tennessee's elderly is undermined by the majority's decision. As statutory interpretation of the TAPA's duty to report is a matter of first impression, the majority's misinterpretation of it will remain in full force and effect unless and until corrected by this Court – as will the diminished protections for Tennessee's increasing elderly resident population and the employees charged with caring for them.

### B. The Need to Secure Settlement of Important Questions of Law

1. Employees who act in good faith pursuant to a mandatory duty to report are entitled to protection from retaliatory discharge in Tennessee.

The issue of whether protection from retaliatory discharge is afforded to an employee who takes action pursuant to a mandatory duty to report is an important question that this Court has not yet visited or settled. This case presents an opportunity for the Court to clarify this point of law.[4]

Here, the plain language of the TAPA creates a mandatory duty to report suspected cases of abuse or neglect. Tenn. Code Ann. 71-6-103(b)(1). Mr. Richmond is a person subject to the

---

[4] The majority did not reach this question because of its misinterpretation of TAPA Section 71-6-103(b)(1) discussed in the prior section. Mr. Richmond respectfully submits that proper interpretation of the mandatory duty to report suspected cases of abuse or neglect could have in itself ended the Court's inquiry, established the *prima facie* case under the TPPA and common law, and resulted in a remand for a trial.

18

mandatory duty to report. He reasonably suspected neglect, reported neglect, and initiated an investigation to determine if neglect occurred. For purposes of this appeal, it must be accepted that Mr. Richmond was fired for abiding by the statutory duty imposed upon him by law. He should be protected for following the law because it is well-settled that "the law of retaliatory discharge stems from Tennessee's public policy that an employee should not be placed in the moral, ethical, and legal dilemma of being forced to choose between reporting or participating in illegal activities and keeping his job" – which is the exact dilemma that Mr. Richmond faced in this case. *Williams v. City of Burns*, 465 S.W.3d 96 (Tenn. 2015).

The Supreme Court has acknowledged that a whistleblower claim could arise from a plaintiff's mandatory duty to report illegal activity. *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 865 (Tenn. 2002). Other Tennessee courts have recognized the same. *VanCleave v. Reelfoot Bank*, 2009 Tenn. App. LEXIS 724; *Coleman v. Humane Soc'y of Memphis*, 2014 Tenn. App. LEXIS 77, *75 (Tenn. Ct. App. 2014). However, the *Crews* Court's recognition of this important principal has been referred to as dicta because the facts of that case involved an employee reporting under a "permissive duty." *Id.* (holding that an in-house attorney who reported the unauthorized practice of law of a superior was protected from retaliatory discharge). *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d at 865. This case is an opportunity to clarify the law and establish that an employee is protected from retaliatory discharge where he acts pursuant to a mandatory statutory duty.

For these reasons, Mr. Richmond requests that the Court grant his Application to settle this important question of law. Because Tennessee law protects employees from retaliatory discharge for reporting pursuant to a permissive duty, the same protections must extend to employees who, like Mr. Richmond, report pursuant to a mandatory duty. Settlement of this important question

19

will have a significant impact on professionals charged with a mandatory duty to report illegal or suspected illegal activities – such as doctors, teachers, child care providers, nurses, and nursing home caretakers. Settlement of this important question also furthers adult and child protection public policies, as persons responsible for their protection can confidently make known their concerns of suspected abuse or neglect without fear of losing their jobs as a result.

## C. The Need for the Exercise of the Supreme Court's supervisory authority

1. The majority's opinion cannot be reconciled with *Mason v. Seaton* and other cases applying the reasonable cause standard in whistleblower cases.

### a. *Overview*

The majority's opinion cannot be reconciled with this Court's decision in *Mason v. Seaton*, 942 S.W.2d 470 (Tenn. 1997), and other similar retaliatory discharge cases applying the "reasonable cause to believe a law, regulation, or rule has been violated or will be violated" standard. *White v. Fort Sanders-Park W. Med. Cir.*, No. E2006-00330-COA-R3CV (Tenn. 2007). Moreover, the majority's failure to apply this standard to the facts in the record, viewing the facts and drawing inferences in favor of Vanguard, and imposing an onerous burden on Mr. Richmond at the *prima facie* stage despite this Court's holding in *Williams v. City of Burns,* 465 S.W.3d 96 (Tenn. 2015), establishes a need for the exercise of this Court's supervisory authority.

The failure of this Court to grant review will leave the majority's opinion intact, resulting in a fundamental shift in both the evidence a plaintiff must present and the evidence a Court is permitted to disregard in its analysis of the reasonable cause standard in retaliatory discharge cases. Judicial focus will be shifted from evaluating whether a reasonable jury could find that an employee had a "reasonable belief" that illegal activity occurred based on "the totality of circumstances known by the employee at the time" of his reporting activity to basing reasonable

cause on a determination of whether the reported act or omission was in fact a violation of the law, irrespective of the employee's knowledge at the time of his report, which is inconsistent with *Mason* and has not been the focus of other courts applying the reasonable cause standard in whistleblower cases. *Gore v. Chardonnay Dialysis*, 2012 U.S. Dist. LEXIS 115408 (M.D. Tenn. 2012); *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015).

The majority improperly assumed the jury's role in this case by deciding that there was not sufficient proof of a violation of the law to justify a report of neglect by Mr. Richmond. But when the complete set of facts and circumstances viewed are properly viewed in the light most favorable to Mr. Richmond as required at the summary judgment stage, it is apparent that he had more than sufficient grounds to report and investigate a vehement complaint of neglect (with physical evidence) about a poorly performing nurse's failure to fulfill her required caretaking duties. Judge Stafford's detailed dissenting opinion shows the extent to which the majority ignored material facts and established precedent in reaching an erroneous conclusion in this case that will affect the outcomes in other similar cases, including those involving the suspected abuse or neglect of multiple classes of vulnerable citizens. (Dissenting Opinion at p. 5).

The majority's opinion takes all facts and circumstances favoring Richmond and sets them aside one-by-one. According to the majority, the only material fact in this case is its conclusion that the neglect complaint at issue was only about "leaving a bandage in a sock." (Opinion at p. 12). Applying an overly narrow focus and drawing a disputed inference in isolation to reach a conclusion in this case does not comport with: (a) the required analysis of Richmond's reasonable cause to believe neglect had occurred; (b) the proper light in which evidence must be viewed and inferences drawn at summary judgment; or (c) this Court's recognition that neglect is, by nature, continuing conduct that "does not lend itself to division into segments of discrete acts having

Case 3:16-bk-03296    Doc 462-1    Filed 09/05/16    Entered 09/05/16 20:51:54    Desc
Exhibit Supreme Court Documents and Complaint    Page 21 of 56

various points of termination." *Mason v. Seaton,* 942 S.W.2d 470 (Tenn. 1997); *Martin v. Norfolk S. Ry. Co*, 271 S.W. 3d 76 (Tenn. 2008); *State v. Adams,* 24 S.W.3d 289, 296 (Tenn. 2000).

### b. *Mason v. Seaton and the Reasonable Cause Standard*

As Judge Stafford concluded in his dissenting opinion, a reasonable juror could easily conclude that a person in Mr. Richmond's position would have taken the same action that he did: report the allegation of neglect and initiate an investigation to determine whether abuse actually occurred. (Dissenting Opinion at p. 5). As discussed in the dissent, the majority's conclusions rest on a dismissal of material facts and drawing inferences against Mr. Richmond rather than in his favor. (Dissenting Opinion at pp. 3, 5).

In *Mason*, the Court held that protection from retaliatory discharge extends to "employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it." *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). A determination of reasonable cause demands a fact-dependent inquiry about the circumstances existing at the time, varying with the circumstances of the case. *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015). Judge Stafford recognized that under the *Mason* standard, "Mr. Richmond must show only that he had reasonable cause to believe that illegal activities were occurring." (Dissenting Opinion at p. 2). The majority ignored a mountain of material facts, which if properly considered change the result in this case.

First, the majority ignored all facts related to the presentation, physical appearance, and potential harm of the bandage. The bandage was presented in a biohazard bag, indicating contamination and harmful enclosed materials. (R.570; R.636). The bandage was three-and-one-half weeks old, indicating a gross neglect of daily monitoring duties. (R. 635). The bandage was observed to be bloody and nasty, indicating contamination and a risk of infection to the elderly

resident. (R. 636). The bandage was not found "loose in a sock" as stated by the majority. It was found stuck directly to Ms. Harris' skin in an at-risk area where she had received months of specialized treatment. (R. 635). Nurse Bayman admitted that the soiled bandage was stuck directly to Ms. Harris' skin and that, even if not directly touching her wound, it was hazardous because it could result in skin alterations, breakdown, and discoloration in as quickly as an hour or two. (R. 769).

Second, the majority ignored all facts establishing the hostile disposition of Mr. Sanders and the fact that Mr. Richmond did not originate the complaint of neglect. Sanders was irate. (R. 638). He was yelling at Richmond and Bayman. Sanders insisted on making a formal complaint of neglect against Bayman, even after multiple efforts to deescalate his anger. (R. 570-572). Sanders threatened litigation and reporting the matter to the State of Tennessee if his concerns were not taken seriously.[5] (R.94; R.103; R. 98). Declaring Mr. Richmond's actions unreasonable as a matter of law without considering the disposition of the originating party or the fact that Richmond was not the party originating the complaint was a grave error, as Judge Stafford recognized in his dissent. (Dissenting Opinion at p. 4).[6]

Third, the majority ignored all facts showing that Bayman was a poorly performing employee with a well-documented history of poor performance and unprofessional conduct. (R.

---

[5] Vanguard's claim that Richmond overreacted is not supported by the record. The evidence reflects that Richmond remained calm and professional the entire time.

[6] Vanguard's effort to label Richmond's response as an "overreaction" is mistaken and misplaced. First, the record affirms that Richmond remained calm the entire time, trying to deescalate the anger of Sanders. Second, Sanders had valid grounds to be upset because the September 4 incident was just one of many recent issues regarding his mother's care. Even if this issue could possibly be seen as an overreaction it must be viewed as one on the part of Sanders, not Richmond. Sanders presented the incident to Richmond in an irate tone and demeanor and with physical and other evidence indicative of neglect. (R.

592-606). In the weeks preceding September 4, 2013, Bayman received multiple complaints about her unprofessional conduct from coworkers; placement on a Performance Correction Notice; placement on a Performance Improvement Plan; and had been recommended for termination by Richmond. (R. 592-606; R. 435-436). Considering the circumstances, Richmond could not give Bayman the benefit of all doubt when targeted with yet another allegation that she had failed to properly perform her caretaking duties.

Fourth, the majority ignored the fact that Bayman had been assigned specific daily monitoring and comprehensive care duties for Ms. Harris. (R. 752-753; R. 570). In explaining the caretaking obligations necessary for Ms. Harris, Mr. Sanders stated: *"[T]he person responsible for monitoring my mother's conditions should have removed the sock completely and made a detailed assessment of the bandages on her ankles and foot area ... this is the level of care required in order to keep my mother from risk. This level of care was necessary under the doctor's orders.*" (R. 571; R. 637). The majority did not recognize that the discovery of a soiled bandage stuck to Ms. Harris' skin and dated "8/11/13" is indicative of insufficient performance of Bayman's daily monitoring duties. The majority also ignored Bayman's admission that she "neglected to do a thorough examination of [Ms. Harris'] foot" when accused of neglect by Sanders. (R. 98).

Fifth, the majority ignored facts unequivocally proving that the complaint of neglect was about far more than one isolated incident, and concerned a pattern of poor care of Ms. Harris. The record included several recent grievances filed by Sanders after finding his mother wet, dirty, and with other related issues. (R.3; R.9; R. 570-72; R.573-580). Although the majority opinion isolated the scope of the neglect complaint to one incident of "leaving a bandage in a sock," Sanders explained the true scope of the neglect in testimony: *I was fed up with the way Mary Beth was taking care of my mother ... It's not just one reason, it's a bunch of reasons. I didn't feel like my*

*mother was getting proper care and just felt like it was negligence."* (R. 641, p.50). The Incident Report reflects that Richmond and Sanders discussed the prior incidents of poor care during his interview. (R. 568-569). Richmond's report of neglect may have been triggered by one incident of neglect but it was based on what reasonably appeared to be part of a larger problem or repeated pattern of neglect. (*Id.*).

Sixth, the majority ignored all facts related to Richmond's written job duties and responsibilities. Vanguard policy required that Richmond investigate "any complaint, allegation, observation, or suspicion of resident abuse, mistreatment or neglect." (R.3; R.796-908). Richmond had a duty to see that resident complaints and grievances were reviewed in a timely manner. *Id.* He was also given the following corporate directive: "When the Administrator receives an allegation of abuse and/or neglect or exploitation, an internal investigation shall immediately commence." (R. 533). Just days before September 4, 2013, Vanguard Corporate told Richmond to "get more aggressive with" addressing Sanders' complaints. (R. 586). The reasonableness of Richmond's report and investigation must be considered in light of the corporate directives and duties Vanguard demanded of him.

Seventh, the majority ignored all facts related to Richmond's responsibilities for assuring facility compliance with state and federal laws. Richmond had a job duty to assure facility compliance with federal, state, and local rules and regulations – including the TAPA. (R.2; R.8; R.521). Richmond was aware that he had a duty to report "suspected" cases of neglect under the TAPA, subject to criminal and civil liability. Tenn. Code Ann. § 71-6-110. Richmond reported the complaint before his termination to corporate compliance agent Arlene Moore, who confirmed that he was taking the proper steps. (R.106). The Vanguard decision-makers obviously disagreed with Moore, but the fact that Vanguard assured Richmond that his actions were reasonable and

appropriate should have been considered by the majority in assessing the reasonableness of his actions at the time.

Significantly, the majority gave no credit to Richmond for the fact that he could not be certain of whether or not the complaint involved a violation of the law without conducting an investigation. Moreover, it held the impossibility of his absolute certainty against him. (Opinion at 12). As Judge Stafford stated in his dissent, "it appears that only because of this investigation can the majority conclude that no neglect occurred. Of course, however, Plaintiff did not have the benefit of an investigation in determining whether to initiate one." (Dissenting Opinion at p. 5).

The majority opinion did not consider or analyze any of the material facts set forth above or draw reasonable inferences from them in favor of Mr. Richmond. Rather, the majority concluded that when faced with this type of neglect complaint, the only reasonable action would be to ignore it and refuse to initiate an investigation. This conclusion cannot be reconciled with Tennessee's strong public policy of protecting the elderly from abuse and neglect by requiring reporting of "suspected cases" of neglect. Tenn. Code Ann. § 71-6-101.

Viewing all of the material facts in this record in the proper light requires the conclusion that a reasonable jury could find in Mr. Richmond's favor. As Judge Stafford found: (1) "the facts in the record indicate that Mr. Richmond had reasonable cause to believe that the bandage could be a part of a larger issue of the possible neglect of Ms. Harris"; (2) "a reasonable juror presented with the foregoing facts could infer the exact opposite: that the discovery of the bandage on Ms. Harris' foot was a sign that Defendant was not properly caring for her"; and (3) "a reasonable person in Plaintiff's position would have taken the same action: report the allegation of neglect and initiate an investigation to determine whether abuse actually occurred." (Dissenting Opinion

26

at pp.4; 3; 5). Accordingly, summary judgment was improperly granted in this case and the Court should reverse the judgment of the Court of Appeals. *Johnson v. Johnson City*, 292 S.W.2d 794, 795 (Tenn. 1956) ("If the minds of reasonable men may differ as to the conclusion to be drawn from the facts, then there is presented a jury question").

*c. Several Key Factual Inferences Were Improperly Resolved in Favor of Vanguard*

The majority's opinion ultimately depends on key inferences being drawn in favor of Vanguard. (Dissenting Opinion at p. 3). This Application will address several of the inferences that the majority found significant in its reasoning and ruling, highlighting the need for this Court's review.

In *Martin*, the Court held that when faced with a motion for summary judgment it "must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor." *Martin v. Norfolk S. Ry. Co.,* 271 S.W.3d 76, 84 (Tenn. 2008) (reversing grant of summary judgment because multiple material facts were ignored, while other material facts were improperly viewed in the light most favorable to the moving party).

Here, the majority concluded that neglect did not occur. But no conclusive determination was ever made about whether or not the cause of the soiled bandage was neglect or part of a larger problem of neglect. (R.765) (Bayman Depo: Q: "But you don't actually know how it was there; that was just your best guess, based on the evidence you gathered? A: Right).

Next, the majority narrowly construed the scope of the neglect complaint to one isolated incident about "leaving a bandage in a sock."[7] Again, Sanders testified that the complaint he made

---

[7] The characterization of the soiled bandage incident as "leaving a bandage in a sock" is: (1) a conclusion as to what caused the bandage to be stuck to Ms. Harris and (2) an improper

to Richmond concerned a "bunch of reasons," including several recent grievances he had filed related to Ms. Harris. (R. 641, p.50). Narrowing the scope of the complaint of neglect to the act that sparked the allegation misconstrues the nature of neglect, which the Court has recognized as continuing in nature and "not lend[ing] itself to division into segments of discrete acts having various points of termination." *State v. Adams*, 24 S.W 3d 289, 296 (Tenn. 2000).

Next, the majority concluded that the bloody bandage being stuck to Ms. Harris' foot was caused by the bandage being "washed in Ms. Harris' sock and inadvertently placed on her foot."[8] (Opinion at p. 11, f.n. 1). Although the majority's conclusion about the cause of the soiled bandage incident is plausible, it is just one of many possibilities. The Court should begin its analysis with an understanding that the following facts are undisputed: (1) the physical appearance of the soiled bandage was "bloody and nasty"; (2) the soiled bandage was found "stuck" firmly to the skin of Ms. Harris; (3) the records contains multiple prior grievances that Ms. Harris had been found "wet and dirty"; and (4) the investigation revealed evidence that dirty socks were used on Ms. Harris at some point. (R. 570-72; R.573-585).

The majority's conclusion fails to consider the following likely probabilities: (1) the adhesive effect of a bandage would likely be lost or reduced if put through a rigorous wash cycle; (2) a bandage's physical appearance as "bloody and nasty" would likely be greatly diminished if washed; and (3) it is more likely than not that the bandage would become separated from the sock

characterization, as the issue was about a bandage that was found stuck directly to Ms. Harris' skin, not loose in a sock as suggested by this language.

[8] This conclusion is premised on another inference favoring Vanguard – that Ms. Harris was properly bathed and clothed in the preceding weeks. (Dissenting Opinion, p. 3). However, no evidence in the record directly concerns Ms. Harris' bathing and clothing schedule. Accordingly, any conclusion that she was properly bathed and changed constitutes drawing inferences in the light most favorable to Vanguard. (Dissenting Opinion, p. 3).

if washed and dried. Thus, it appears more logical that the cause of the bloody bandage being stuck to Ms. Harris' foot was the result of neglect – either in the form of insufficient monitoring or the placement of dirty socks on Ms. Harris by Defendant.[9] As Judge Stafford recognized in his dissent, "Common sense indicates that routine bathing and changing clothes are 'necessary to maintain the health and welfare' of Ms. Harris and the failure to perform these tasks could constitute neglect." (Dissenting Opinion at p. 4).

Lastly, the majority concluded that "there is nothing in the statement of undisputed facts to indicate that the old bandage, *which was dated 8/11/2013*, or the same sock had been on the foot of Ms. Harris for the three weeks that had transpired since August 11." (Opinion at p. 11). This conclusion ignores the date on the bandage itself ("8/11/2013"), which indicates that it could have been stuck to Ms. Harris' foot for an extended period of time. "Although the majority infers that Ms. Harris experienced no neglect in the weeks preceding the soiled bandage's discovery, a reasonable juror presented with the foregoing facts could infer the exact opposite: that the discovery of the bandage on Ms. Harris' foot was a sign that Defendant was not properly caring for her." (Dissenting Opinion at p. 3). For these reasons, Mr. Richmond requests that the Court grant his Application, exercise its supervisory authority, and reverse the judgment of the Court of Appeals.

---

[9] Judge Stafford took issue with the majority's "logical inference." He recognized Richmond's evidence of correspondence from Vanguard's corporate representatives stating that during the investigation they "counted three dirty pair of socks that was in the laundry out of five days – which indicated clean socks were not used for this resident at some point." (Dissenting Opinion at p. 4)

     *d. Richmond Should Not Have Been Held to a "Formidable Burden" to Establish a Prima facie Case under the TPPA.*

The "formidable burden" imposed on Mr. Richmond by the majority of the Court of Appeals cannot be reconciled with this Court's holding that a plaintiff's *prima facie* burden in a retaliatory discharge case is not onerous. Judge Stafford correctly recognized that courts "must be cautious not to place too high a burden on plaintiffs" at the *prima facie* and summary judgment stages. (Dissenting Opinion at p. 2).

The Court recently held that in a retaliatory discharge case the burden of establishing a *prima facie* case under the TPPA "is not onerous." *Williams v. City of Burns*, 465 S.W.3d 96, 113 (Tenn. 2015). The United States Supreme Court and the U.S. Court of Appeals for the Sixth Circuit also hold that this burden of "is not onerous" but, rather, "easily met." *Young v. UPS*, 135 S.Ct. 1338, 1354 (2015); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981); *Nguyen v. City of Cleveland*, 228 F.3d 559, 563 (6th Cir. 2000).

Elder neglect is in violation of the law of Tennessee. Tenn. Code Ann. § 71-6-102(1)(A) broadly defines neglect as "the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult." [10] Richmond also pointed to Tenn. Code Ann. § 71-6-103(b)(1), which imposed a mandatory duty on him to report suspected cases of abuse or neglect. Richmond identified circumstances that resulted in his belief that Bayman had neglected Ms. Harris. As Judge Stafford stated, under the TAPA, the "definition [of neglect] is quite broad and could be

---

[10] The Supreme Court affirms that "acts of ordinary negligence are the very types for which our General Assembly intended to redress under the TAPA." *Estate of French v. Stratford House*, 333 S.W.3d 546, 564-565 (Tenn. 2011). This Court has held that "ordinary negligence" and "deprivations of ordinary care" are illegal under the TAPA. *Id.*

reasonably interpreted to include the conduct at issue in this case." (Dissenting Opinion at pp. 2-3).

Further, in similar cases in which the employee has identified a specific law and conduct he or she reasonably believed to have violated that law, Tennessee courts have left the determination of whether his or her belief was reasonable to the jury. *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997) (holding that employee was able to satisfy the "illegal activity" element of a retaliatory discharge claim where she had reasonable cause to believe that the employer had violated a specific law and acted in good faith when reporting it); *Gore v. Chardonnay Dialysis*, 2012 U.S. Dist. LEXIS 115408 (M.D. Tenn. Aug. 16, 2012) (same); *White v. Fort Sanders-Park W. Med. Ctr.*, No. E2006-00330-COA-R3CV, 2007 Tenn. App. LEXIS 53, *11 (Tenn. Ct. App. 2007) (same).

Here the majority held Mr. Richmond to a "formidable burden" to satisfy the "illegal activities" element of his *prima facie* case, relying on several *pre-Williams* cases and demanding that he substantiate the actual illegality of the reported act or omission. (Opinion at pp. 8-10); citing *Sanders v. Henry Cnty.*, No W2008-018332-COA-R3-CV, 2009 WL 1065916; citing *Hill*, 2001 WL 694479, at *5; *Darnall*, 1999 WL 346225, at *5. Each case cited by the majority is factually dissimilar to the facts of this case. Moreover, the cases relied on by the majority were overruled by *Williams* to the extent that they imposed a formidable burden on a plaintiff in a whistleblower case of establishing a *prima facie* case at the summary judgment stage.

For these reasons, Mr. Richmond requests that the Court grant his Application, exercise its supervisory authority and reverse the judgment of the Court of Appeals.

e. *The Supreme Court Should Issue Guidance on the Proper Application of the Mason Standard.*

The Tennessee Supreme Court has never given detailed guidance about the manner in which lower courts must apply the reasonable cause standard in whistleblower cases. However, the intent of *Mason* in demanding a comprehensive, fact-dependent inquiry into the circumstances existing at the time of the plaintiff's report is clear. Judge Stafford's well-reasoned dissent demonstrates that the majority's departure from the *Mason* standard warrants this Court's review so that the bench and bar will have proper guidance in future whistleblower cases in which an employee's reasonable belief that illegal activity has occurred is at issue.

The totality of circumstances approach is accepted by the overwhelming majority of courts applying a reasonable cause standard in whistleblower actions, including the Sixth Circuit. In *Rhinehimer v. U.S. Bancorp, Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015), the court held that "reasonableness of the employee's belief will depend on the totality of circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint." *Id*. The Sixth Circuit also recognizes that:

> "the issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts known to the employee amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring. If, on the other hand, reasonable minds could disagree about whether the employee's belief was objectively reasonable, the issue cannot be decided as a matter of law"

*Id*. at 811-812 (internal citations omitted). Thus, the reasonableness of an employee's belief that illegal activity has occurred is typically a question for the jury to decide.

For these reasons, Mr. Richmond requests that the Court grant his Application to review this issue under its supervisory authority so that the bench and bar can have proper guidance in

future cases under the TPPA. Mr. Richmond respectfully requests that the Court adopt a totality of the circumstances or similar standard.

### D. The need to secure questions of public interest.

The safety and protection of adults from abuse and neglect is of paramount importance. Recent statistics confirm that over three million people live in nursing homes in the United States, and the population of people over age 65 is rapidly growing. (National Center on Elder Abuse Statistics, attached hereto to Rule 11 Appendix, p. 1). Statistics studies confirm that more than 40% of people over the age of 65 will reside in a nursing home during their lifetime. (*Id*. at p.7). In Tennessee, there are over 300 nursing homes and assisted living facilities. (AARP Public Policy Institute Statistics, attached hereto Rule 11 Appendix, p. 11). Vanguard owns and operates at least six nursing home facilities in Tennessee, and several others in Florida, Mississippi, and West Virginia. (R.1; R.7).

There are over two million reported cases of elder abuse or neglect each year and, despite this large number, elder abuse and neglect are vastly underreported harms. (National Center on Elder Abuse Statistics, p. 7). In a study, 44% of nursing home residents reported that they had been abused, while 95% reported that they had been neglected or seen another resident neglected. (*Id*. at p.7). Elderly residents with dementia, such as Ms. Harris, have even higher percentages of abuse. (*Id*. at p. 3). Over 50% of nursing home staff admitted to mistreating adult residents, with two-thirds of those incidents of mistreatment involving neglect. (*Id*. at. 7). Elderly residents who suffered abuse or neglect have a 300% higher risk of death and other serious infirmities. (*Id*. at p. 4.)

The enactment of the Tennessee Adult Protection Act shows that the legislature understands adult abuse and neglect is a matter of paramount importance to the public. The General Assembly's

legislative intent of protecting adults from abuse and neglect "by requiring reporting of *suspected* cases by any person having cause to believe such cases exist" is thwarted by the majority opinion's holding in this case.

To remove protection from retaliatory discharge for employees who act in furtherance of the purpose of the TAPA bespeaks grave harm to the public and undermines the purpose of the statute. The majority's reasoning essentially demands that employees "assume the risks" of losing their jobs in attempting to further public policy by reporting suspected cases of abuse and neglect. Nursing home employees are laypersons, not legal experts, and this clear public policy is vastly undermined by imposing such a perilous risk on them and their families. The *Mason* standard is designed to prevent such an outcome. Finally, there is also the unintended incentive provided to employers to seek punitive retribution against employees who properly report perceived violations of the law. Employers are provided the callous incentive to discharge employees who make reports that are not conclusively substantiated as illegal activities. Indeed, the majority opinion gives them both a shield and a sword. Employers gain a shield from a retaliatory discharge claim under such circumstances, while gaining the sword of *carte blanche* to fire those persons most likely to report illegalities. This result undermines the purpose of retaliatory discharge laws, which seek to encourage employees to report violations of laws that further public policy, such as adult protection laws. As Judge Stafford recognized in his dissent, "The majority's Opinion ultimately denies plaintiffs like Mr. Richmond and the elderly citizens of Tennessee protection to which they are entitled under the law." (Dissenting Opinion at p. 5).

The important question of the strong public policy in Tennessee regarding the protection of the elderly from abuse or neglect justifies this Court exercising its supervisory authority and reversing the judgment of the Court of Appeals.

34

## V. **CONCLUSION**

This is a worthy case justifying the time, expense, and effort of hearing this matter before the Supreme Court. This case includes a strong and well-reasoned dissent; concerns a strong public policy designed to protect the public health, safety, and welfare; and involves multiple issues of first impression, important questions of law, and conflicts among the courts on the application of the legal standards at issue in this case. As shown, there is a substantial need for this Court to address the questions presented in this Application. Accordingly, Mr. Richmond respectfully requests that the Court grant his Application and reverse the judgment of the Court of Appeals.

Respectfully submitted,

THE WINFREY FIRM

By: _____
Brian C. Winfrey (BPR #025766)
The Winfrey Firm
2002 Richard Jones Rd., Suite B-200
Nashville, Tennessee 37215
Attorney for Plaintiff-Appellant Daniel Richmond

## **CERTIFICATE OF SERVICE**

I, Brian C. Winfrey, certify that I have forwarded a true and exact copy of this pleading by electronic mail and First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 11 of the Tennessee Rules of Appellate Procedure on this the 29th day of March 2016, including Counsel for Defendants, Ben H. Bodzy, Baker Donelson, Bearman, Caldwell & Berkowitz, P.C., 211 Commerce Street, Nashville, Tennessee 37201.

_____

Brian C. Winfrey

35

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 13, 2015 Session

FILED
JAN 2 9 2016
Clerk of the Courts
Rec'd By _____

## DANIEL RICHMOND v. VANGUARD HEALTHCARE SERVICES, LLC, ET AL.

### Appeal from the Circuit Court for Bedford County
### No. 2013cv12702     Franklin L. Russell, Judge

---

### No. M2014-02461-COA-R3-CV

---

J. STEVEN STAFFORD, DISSENTING.

The majority Opinion concludes that a reasonable juror (1) could not find that Mr. Richmond had reasonable cause to believe the presence of the soiled bandage was connected to "illegal activity," as required by the Tennessee Public Protection Act ("TPPA"), and (2) could not find that Mr. Richmond could demonstrate that his termination for reporting the incident violated any clear public policy under his common law claim. Because I conclude that a reasonable juror could conclude that Mr. Richmond had reasonable cause to believe that the presence of the soiled bandage stemmed from neglect of the patient, I must respectfully dissent.

To prevail under the TPPA, Tennessee Code Annotated Section 50-1-304, the plaintiff must establish:

> (1) his status as an employee of the defendant employer;
>
> (2) **his refusal to participate in, or remain silent about, "illegal activities" as defined under the Act**;
>
> (3) his termination; and
>
> (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination.

Tenn. Code Ann. § 50-1-304 (emphasis added); *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006). Of the four required elements, the majority Opinion concludes that element two is dispositive because the conduct alleged to be illegal in this case simply does not rise to the level of "illegal activities" as required by the statute.[1]

As discussed by the majority Opinion, "illegal activities" are defined as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. §50-1-304(a)(3). Our Supreme Court, in *Mason v. Seaton*, 942 S.W.2d 470 (Tenn.1997), held that the TPPA's protection extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated. *Mason*, 942 S.W.2d at 472 (citing *Melchi v. Burns Int'l Security Servs., Inc.*, 597 F.Supp. 575, 583 (E.D. Mich. 1984)). Accordingly, Mr. Richmond must show only that he had reasonable cause to believe that illegal activities were occurring. In addition, although the case relied upon by the majority on this issue indicates that plaintiffs face a "formidable burden" in establishing this element of the claim of retaliatory discharge, *see Sanders v. Henry Cnty.*, No. W2008-01832-COA-R3-CV, 2009 WL 1065916 (Tenn. Ct. App. Apr. 21, 2009),[2] the Tennessee Supreme Court has more recently held that "the burden to establish a prima facie case [under the TPPA] is **not onerous**." *Williams v. City of Burns*, 465 S.W.3d 96, 113 (Tenn. 2015) (emphasis added) (citing *Lin v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2008-00212-COA-R3-CV, 2008 WL 4613559, at *5 (Tenn. Ct. App. Oct. 10, 2008)). Thus, we must be cautious not to place too high a burden on plaintiffs with regard to this element.

Here, Mr. Richmond specifically alleges that his complaint regarding the soiled bandage evidences his refusal to take part in and/or be silent about the neglect of the patient. There appears to be no dispute in this case that neglect of a patient in a health care facility is illegal under the Tennessee Adult Protection Act ("TAPA"), and therefore constitutes illegal activity for purposes of the retaliatory discharge statute. The issue in this case, instead, concerns whether Mr. Richmond's belief that neglect was occurring was reasonable under the circumstances. The TAPA defines neglect, in relevant part, as "the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult." Tenn. Code

---

[1] This dissent only addresses the issue of whether the alleged wrongful activity constitutes illegal activity under the statute. I express no Opinion regarding whether Plaintiff refused to participate or be silent in such activity, or whether any of the other essential elements of a statutory retaliation claim are met.

[2] The majority Opinion includes a discussion of the cases in *Sanders* in which a plaintiff's belief that illegal activity was occurring was determined to be unreasonable, but omits the two cases discussed in which the court determined that the plaintiffs' belief were reasonable. *See Sanders*, 2009 WL 1065916, at *8, 10 (citing *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997) (holding that employee was able to satisfy the "illegal activity" element of a retaliatory discharge claim where she had reasonable cause to believe that employer had violated a specific law and acted in good faith when reporting);*White v. Fort Sanders-Park W. Med. Ctr.*, No. E2006-00330-COA-R3CV, 2007 WL 241024, at *4 (Tenn. Ct. App. Jan. 29, 2007) (same)).

Ann. § 71-6-102(1)(A). In my view, this definition is quite broad and could be reasonably interpreted to include the conduct at issue in this case.

The majority Opinion concludes that "finding an old bandage on the bottom of Ms. Harris's foot" was insufficient to create a reasonable belief that Ms. Harris was the victim of neglect. To reach this conclusion, the majority relies upon the fact that "there is nothing in the statements of undisputed facts to indicate that the old bandage . . . or the same sock had been on the foot of Ms. Harris for the three weeks that had transpired since August 11." In Mr. Richmond's Statement of Undisputed Facts, however, he asserts that "Defendant did not definitively determine the cause of [the] outdated bandage's placement on the foot of Ms. []Harris on September 4, 2013." Thus, although the majority infers that Ms. Harris experienced no neglect in the weeks preceding the soiled bandage's discovery, a reasonable juror presented with the foregoing facts could infer the exact opposite: that the discovery of the bandage on Ms. Harris's foot was a sign that Defendant was not properly caring for her.

When faced with a motion for summary judgment, the court "must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999). Despite this directive, however, the majority goes on to consider, but purportedly not rely upon, the "logical and reasonable inference" that Ms. Harris was bathed properly between August 11 and September 4, but that the bandage was accidently left in the sock when the sock was removed or the "logical" inference that the bandage was "washed in Ms. Harris['s] sock and inadvertently placed back on her foot." Respectfully, it is not the purview of this Court to pass judgment upon the inferences that could be made in the moving party's favor at the summary judgment stage. *See Martin*, 271 S.W.3d at 84. Although the majority provides that it is not relying on these inferences in favor of Defendant, in my view, its conclusion ultimately depends on these inferences being drawn in the moving party's favor. Indeed, the majority concludes that Ms. Harris was properly bathed. No evidence in the record, however, directly concerns Ms. Harris's bathing and clothing schedule; accordingly, any conclusion that she was properly bathed and changed must constitute an inference in the moving party's favor. While seemingly focusing on the inferences that could be made in Defendants' favor, the majority disregards considerable evidence and inferences that can be made in Plaintiff's favor.

First, the soiled bandage was placed in a biohazard bag, indicating its potential to cause harm. Although the majority characterizes Mr. Richmond's report as an overreaction, Nurse Bayman admitted in her deposition that the soiled bandage could cause alterations, breakdowns, and discolorations on the skin. Furthermore, there is some evidence in the record to directly contradict the majority's "logical" infererence that the bandage was washed in the sock, as evidence in the record suggests that a search of Ms. Harris's room after the

- 3 -

incident indicated that Ms. Harris was not being provided clean socks every day.[3] Based upon this evidence a reasonable person could infer that there were other instances in which Ms. Harris was not properly washed and clothed. Common sense indicates that routine bathing and changing clothes are "necessary to maintain the health and welfare" of Ms. Harris and that the failure to perform these tasks could constitute neglect. *See* Tenn. Code Ann. § 71-6-102(1)(A). Although the majority minimizes the importance of the discovery of the soiled bandage, the facts in the record indicate that Mr. Richmond had reasonable cause to believe that the bandage could be part of a larger issue of the possible neglect of Ms. Harris.

Finally, and most importantly, the allegation of abuse and neglect did not originate with Plaintiff. Instead, it was Mr. Harris's son who first made a complaint, indicating that "[Nurse Bayman] did not act properly in the care of my mother and that my mom had been neglected pursuant to the Doctor's orders." Indeed, the record indicates that Ms. Harris's son had filed several grievances previously complaining that his mother was "wet, dirty, or had other related issues," when he arrived to visit her. Moreover, this was not the first complaint directed at Nurse Bayman's treatment of residents, as the record includes several complaints and a performance review of Nurse Bayman, citing her poor performance and unprofessional behavior. Curiously, none of the foregoing facts related to Nurse Bayman are weighed by the majority despite them likely playing a role in Mr. Richmond's decision to report.

Because of Plaintiff's role as administrator in a nursing home, Ms. Harris's son's complaint implicated Plaintiff's duty to investigate and report any reasonable allegations of abuse or neglect. *See* Tenn. Code Ann. § 71-6-103(b)(1). Indeed, in this case, the impetus to report wrongdoing is more than a mere moral imperative, it is a statutory directive. According to Tennessee Code Annotated Section 71-6-103(b)(1):

> Any person, including, but not limited to, a physician, nurse, social worker, department personnel, coroner, medical examiner, alternate care facility employee, or caretaker, having reasonable cause to suspect that an adult has suffered abuse, neglect, or exploitation, shall report or cause reports to be made in accordance with this part.

Section 71-6-105 provides that "any person making a report under this part . . . shall be presumed to be acting in good faith." However, a person who knowingly fails to make a report required by statute has committed a Class A misdemeanor. Tenn. Code Ann. § 71-6-110.

---

[3] Specifically, the record includes correspondence between Vanguard Health Care Services' corporate represetantives that states: "During the conversation possibilities of how this occurred came up and prior to the statement of negligence being made, the [Director of Nursing] and [Mr. Richmond] and [Ms. Harris's family] went to the resident[']s room and looked through dirty clothing and counted three dirty pair of socks that was in the laundry out of five days – indicated clean socks were not used for this resident at some point."

- 4 -

Here, the majority Opinion admits that Ms. Harris's son lodged a formal complaint about his mother's care and that he was visibly "upset and angry." Respectfully, the majority Opinion fails to consider whether a reasonable person facing the factors Mr. Richmond was forced to balance—his duty to report, possible termination, and potential criminal liability—could have "reasonable cause" to suspect illegal activity. Instead, the majority appears to conclude that when faced with this type of complaint, the only reasonable action would have been to ignore the complaint of abuse and refuse to initiate an investigation. As we opined in *Franklin v. Swift Transportation Co.*, 210 S.W.3d 521, 530 (Tenn. Ct. App. 2006):

> [T]he law of retaliatory discharge stems from Tennessee public policy that an employee should not be placed in the moral, ethical and legal dilemma of being forced to choose between reporting or participating in illegal activities and keeping his job. *See Henderson v. Corrs. Corp. of America*, 918 F.Supp. 204, 210 (E.D. Tenn. 1996); *Griggs v. Coca–Cola Employees' Credit Union*, 909 F.Supp. 1059, 1064 (E.D. Tenn. 1995). That does not, however, end the inquiry. Under both the Public Protection Act and the common law, the "illegal activity" or violation by the employer must implicate important public policy concerns as well.

There is no dispute that strong public policy in Tennessee supports reporting suspected cases of elder abuse and neglect. The only dispute here is whether Plaintiff's belief that elder neglect occurred was reasonable under the circumstances. Based upon the foregoing, I must respectfully disagree with the majority and conclude that a reasonable person in Plaintiff's position would have taken the same action: report the allegation of neglect and initiate an investigation to determine whether abuse actually occurred. Indeed, it appears that only because of this investigation can the majority conclude that no neglect occurred. Of course, however, Plaintiff did not have the benefit of an investigation in determining whether to initiate one. In light of the numerous inferences that may be drawn from the facts in the record, I am of the opinion that the question of reasonable cause is better reserved for the trier of fact in this case. *Johnson v. Johnson City*, 292 S.W.2d 794, 795 (Tenn. 1956) ("[I]f the minds of reasonable men may differ as to the conclusion to be drawn from the given facts, then there is presented a jury question.").

Equally important, I am concerned that plaintiffs similarly situated to Mr. Richmond will be placed in a precarious situation—that is, being faced with a statutory duty to report based on the strong policy of preventing elder abuse, and the fear of his employer terminating him. The majority's Opinion ultimately denies plaintiffs like Mr. Richmond and the elderly citizens of Tennessee protection to which they are entitled under the law. Mr. Richmond's

decision to report, in my view, was prompted by reasonable cause to believe Ms. Harris had been neglected at some point in her care.

Based on the foregoing, I would conclude that the record indicates summary judgment is not appropriate for the "illegal activity" prong of the TPPA claim and the "public policy" prong of his common law claim. Consequently, I would reverse the grant of summary judgment.

J. STEVEN STAFFORD, JUDGE

- 6 -

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 13, 2015 Session

## DANIEL RICHMOND v. VANGUARD HEALTHCARE SERVICES, LLC ET AL.

Appeal from the Circuit Court for Bedford County
No. 2013-CV-12702    Franklin L. Russell, Judge

FILED

JAN 2 9 2016

Clerk of the Courts
Rec'd By _____

### No. M2014-02461-COA-R3-CV

The former administrator of an assisted living facility appeals the summary dismissal of his claim for retaliatory discharge under the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and common law. Plaintiff contends he was fired in retaliation for initiating an internal investigation and submitting an internal report to his supervisors concerning an incident that arose when the son of an elderly resident observed an old bandage stuck to the bottom of his mother's foot, which was revealed when her sock was removed in order to check the dressing for a wound on her ankle. Defendants contend Plaintiff's claims are legally deficient because there was no neglect or illegal activity to report, and that Plaintiff grossly overreacted after being informed that an old bandage was found on the ball of a resident's foot in a sock when the resident's wound, which was on her ankle, was properly dressed and bandaged. Defendants also rely on the fact that Plaintiff did not file a qualifying internal or external report of neglect until after he was fired. The trial court summarily dismissed the TPPA claim stating "leaving a bandage in a sock, where a patient's wound is in fact otherwise sufficiently bandaged, is not illegal activity as defined by the statute. Leaving the bandage in the sock is not 'abuse and neglect' as defined in the statute." The court dismissed the common law whistleblower claim because Plaintiff did not show that Defendants engaged "in illegal conduct or in any way . . . posed a threat to an important public policy of the State when all that was done was to leave an old bandage in a patient's sock." Plaintiff appeals the summary dismissal of his claims under the TPPA and common law. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD H. DINKINS, J., joined. J. STEVEN STAFFORD, P.J., W.S., filed a dissenting opinion.

Brian Christopher Winfrey, Nashville, Tennessee, for the appellant, Daniel Richmond.

Benjamin Henry Bodzy and Megan Michelle Sutton, Nashville, Tennessee, for the appellees, Vanguard Healthcare Services, LLC and Glen Oaks Health and Rehabilitation.

## OPINION

Daniel Richmond ("Plaintiff") was hired in 2012 by Vanguard Healthcare Services, LLC, as the Nursing Home Administrator of Glen Oaks Health and Rehabilitation in Shelbyville, Tennessee, an assisted living, rehabilitation, and nursing home facility owned and operated by Vanguard Health Services. Plaintiff's primary responsibility was to oversee the day-to-day operations of Glen Oaks.

Willar Grace Harris, an elderly resident at Glen Oaks, had a persistent wound on her ankle that required daily monitoring at the facility as well as weekly visits to the Wound Care Clinic for treatment. Richard Sanders, the son of Ms. Harris, was with his mother when she went to the Wound Care Clinic on September 4, 2013, for a routine, weekly examination of the wound on her ankle. When an attendant removed her sock to examine the wound on the ankle there was an old bandage on the bottom of Ms. Harris' foot. The bandage, which was dated "8/11/2013," was given to Mr. Sanders.

When his mother's visit at the Wound Care Clinic was completed, Mr. Sanders travelled directly to Glen Oaks to register a formal complaint about his mother's care. When he arrived at Glen Oaks, Mr. Sanders, who was visibly upset and angry, confronted Mary Beth Bayman, the Director of Nursing who was primarily responsible for Ms. Harris' care. Ms. Bayman then escorted Mr. Sanders to Plaintiff's office where the three of them discussed Mr. Sanders' concerns. Ms. Bayman explained that it was not necessary to fully remove the sock to examine, dress and bandage the wound on Ms. Harris' ankle; instead, she would pull the sock down far enough to determine that the ankle was appropriately dressed and bandaged. Plaintiff informed Mr. Sanders that an internal investigation would be initiated immediately. Plaintiff prepared a written report of the incident, submitted it to his supervisors, and gave Mr. Sanders a copy of the internal report.[1]

Two days later, on September 6, 2013, Plaintiff's employment was terminated. Plaintiff states that he was terminated in retaliation for reporting the incident concerning Ms. Harris. Vanguard Healthcare Services, LLC, and Glen Oaks Health and Rehabilitation ("Defendants") insist his employment was terminated for several reasons, including his overreaction to and improper handling of the incident concerning Ms. Harris and Plaintiff's history of overreacting to routine matters, which resulted in clashes

---

[1] The internal report was given to Mr. Sanders and submitted to Plaintiff's supervisors on the same day as Ms. Harris' visit to the Wound Care Clinic, September 4, 2013.

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 43 of 56

with staff at Glen Oaks and with Plaintiff's supervisor, Mark Miller. Plaintiff counters stating he had never been issued a formal written reprimand prior to his termination.

After his termination, Plaintiff submitted a written report to DHS concerning the alleged neglect of Ms. Harris.[2]

On October 13, 2013, Plaintiff commenced this action asserting a claim for retaliatory discharge in violation of the Tennessee Adult Protective Act ("TAPA"), Tenn. Code Ann. § 71-6-105; the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 56-1-304; and Tennessee common law. Defendants filed an answer denying any liability. Thereafter, discovery was taken, including the deposition of Plaintiff and representatives of Defendants.

Defendants subsequently moved for summary judgment seeking the dismissal of all claims. Defendants asserted that Plaintiff's retaliation claim for violation of the TAPA should be summarily dismissed because he failed to report the alleged neglect in the manner required by the statute.[3] As for the TPPA and common law claims, Defendants asserted that they fail because (1) Defendants were not engaged in illegal activity; and (2) Plaintiff did not timely report the alleged neglect to anyone other than Defendants. Further, Defendants also asserted that the TPPA claim fails because Plaintiff is unable to establish that his refusal to remain silent about illegal activities was the sole cause of his termination.

Pursuant to a Memorandum Opinion entered on November 26, 2014, the trial court summarily dismissed all claims; it reads in pertinent part:

> The case was filed as a claim under the [TPPA], the [TAPA], and as a unlawful termination claim under Tennessee common law arising from the termination of Plaintiff Daniel Richmond ("Employee") from his employment as Chief Licensed Nursing Home Administrator at Defendant Glen Oaks Health and Rehabilitation ("Glen Oaks"), owned by Defendant

---

[2] No report was submitted to the Tennessee Department of Human Service ("DHS") or anyone outside of Plaintiff's chain of command until after Plaintiff was terminated.

[3] The TAPA provides that "[a]ny person, including, but not limited to, a physician, nurse, social worker, department personnel, coroner, medical examiner, alternate care facility employee, or caretaker, having reasonable cause to suspect that an adult has suffered abuse, neglect, or exploitation, shall report [such abuse]." Tenn. Code Ann. § 71-6-103(b)(1). This reporting obligation can be satisfied by: (1) reporting the abuse or neglect directly to DHS; or (2) by internally reporting pursuant to specific company procedures that have been approved by DHS. *Wynn v. Five Star Quality Care Trust*, No. 3:13-cv-01338, 2014 WL 5107057, at *3 (M.D. Tenn., Oct. 10, 2014). TAPA provides a civil cause of action for any person who suffers a detrimental change in their employment status by reason of making a qualifying report. Tenn. Code Ann. § 71-6-105.

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 44 of 56

Vanguard Healthcare. For the reasons set out below, summary judgment will be granted.

On September 4, 2013, the son of a patient at Glen Oaks complained that the Director of Nursing at Glen Oaks' facility in Shelbyville, Mary Beth Bayman, had not properly cared for a patient. The specific allegation is that a bandage was found in one of the patient's socks beneath her foot after the bandage had previously been on the ankle of the patient. The injury for which the bandage had originally been placed on the patient was, at the time of discovery of the old bandage, covered by a fresh bandage. There is no sworn expert evidence before this trial court that the presence of the old bandage was in any way detrimental to the health and safety of the patient.

The employment of the Employee was terminated two days later, on September 6, 2013, after the Employee had reported internally the alleged poor care provided by Ms. Bayman, that is, to individuals on the Defendants' payroll, initiating an investigation of the incident. The Complaint alleges that the Defendants "expressed their disdain" and "expressed their hostility" toward and "ultimately terminated" the Plaintiff Employee because he "refused to keep the incident quiet or diffuse the allegations". . . . There is no mention in the Complaint of any allegation that the Employee was terminated because he refused to participate in any illegal activity. It is uncontroverted that the Plaintiff Employee did not report the alleged abuse to anyone outside of the Defendants until after his termination. It is also undisputed that the Defendants have a policy for reporting patient abuse, but it is undisputed that the policy had never been submitted to the Tennessee Department of Human Services for approval.
. . .

As to the TAPA claim, the Employee would have had to report the abuse either to the Department of Human Services, or if, and only if, DHS had approved Glen Oaks' internal reporting scheme, the Employee would have had to report the alleged abuse following the internal procedures in order to be entitled to protection. In this case it is undisputed that the internal Glen Oaks procedure had not been approved by DHS before being fired. The Defendants are entitled to summary judgment as to the TAPA claim.

In order to establish a claim under TPPA, the Employee would have to prove, among other things, that he had refused to participate in or remain silent about illegal activities and that the refusal to participate in or remain silent about illegal activities was the sole cause of his termination. First, there is not in the Complaint any allegation of a refusal to participate in illegal activity, and there is no evidence in the sworn record that the

- 4 -

Employee did so. Secondly, leaving a bandage in a sock, where a patient's wound is in fact otherwise sufficiently bandaged, is not illegal activity as defined by the statute. Leaving the bandage in the sock is not "abuse and neglect" as defined in the statute.

. . .

As to the common law whistleblower claim, the Employee must prove that a substantial factor in the discharge was his speaking out about illegal activities if an important public policy interest of the State has been embodied in the law. As explained above, Glen Oaks is not shown to have been engaged in illegal conduct or in any way to have posed a threat to an important public policy of the State when all that was done was to leave an old bandage in a patient's sock. No reasonable fact finder could find that Glen Oaks was engaged in illegal conduct.

Summary judgment will be granted in favor of the Defendants.

On appeal, Plaintiff contends the trial court erred by summarily dismissing his TPPA and common law claims based on its finding that Defendant was not shown to have engaged in illegal activity.[4] Plaintiff contends it was error to dismiss these claims because he had reasonable cause to believe that the reported incident constituted illegal activity. Further, Plaintiff insists he had a mandatory duty to report all "suspected" cases of neglect; therefore, his actions are protected regardless of whether the reported incident is proven to meet the statutory definition of neglect.[5]

### ANALYSIS

The employment-at-will doctrine is "a bedrock of Tennessee common law" and is a fundamental principle controlling the employer-employee relationship. *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015) (quoting *Franklin v. Swift Tranp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006)). Under the doctrine, employment for an

---

[4] Plaintiff does not challenge the summary dismissal of his TAPA claim.

[5] Plaintiff articulated two additional issues; we believe the issue identified above incorporates Plaintiff's challenges to the trial judge's rulings. The other two issues read:

1. Under the TPPA and common law, must an employee conclusively prove that the reported incident was an actual violation of the law in order to satisfy the "illegal activity" element of a retaliatory discharge cause of action?
2. Under the TPPA and common law, is an employee terminated for making a well-founded good faith report of neglect protected from retaliatory discharge if a trial court later finds that the reported incident was not proven by the employee to meet the statutory definition of neglect at summary judgment?

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 46 of 56

indefinite period of time may be terminated by either the employer or the employee at any time and for any reason. *Id.* This doctrine, however, is not absolute, and some restrictions have been imposed on the right of an employer to discharge an employee. *Id.* At issue in this appeal are Plaintiff's claims under two of the recognized exceptions to the employment at-will doctrine: (1) the Tennessee Public Protection Act; and (2) the Tennessee common law. *See Williams v. Greater Chattanooga Public Television Corp.*, 349 S.W.3d 501, 513 (Tenn. Ct. App. 2011). We shall first discuss the TPPA claim.

## I. THE TENNESSEE PUBLIC PROTECTION ACT

The TPPA creates a cause of action for employees that are "discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b)-(c). In cases of retaliatory discharge under the TPPA, courts apply a burden-shifting analysis similar to the one used in federal courts under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6] *See* Tenn. Code Ann. § 50-1-304(f); *Williams*, 465 S.W.3d at 111. Tennessee's burden-shifting framework operates as follows:

> In any civil cause of action for retaliatory discharge brought pursuant to this section, or in any civil cause of action alleging retaliation for refusing to participate in or remain silent about illegal activities, the plaintiff shall have the burden of establishing a prima facie case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. . . . The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of unlawful retaliation.

Tenn. Code Ann. § 50-1-304(f). In cases accruing on or after June 10, 2011, this burden-shifting framework applies at all stages of litigation, including motions for summary judgment. *See* Tenn. Code Ann. § 50-1-304(f).[7]

---

[6] The Tennessee Supreme Court has noted that the analytical framework set forth in the amended TPPA is "virtually indistinguishable" from the *McDonnell Douglas* approach. *Williams*, 465 S.W.3d at 113 n.15.

[7] In *Kinsler v. Berkline, LLC*, 320 S.W.3d 18, 26 (Tenn. 2011) and *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010), the Tennessee Supreme Court held that the summary judgment analysis is
(continued...)

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 47 of 56

At the first stage of the *McDonnell Douglas* analysis, a plaintiff employee bears the burden of presenting evidence to establish a prima facie case of retaliatory discharge. *Williams*, 465 S.W.3d at 113. A plaintiff who asserts a claim under the TPPA must establish: (1) that he was an employee of the defendant; (2) that he refused to participate in or remain silent about "illegal activities" as defined by the statute; (3) he was terminated; and (4) an exclusive causal relationship existed between his refusal to participate in or remain silent about illegal activities and his termination.[8] *Franklin*, 210 S.W.3d at 528.

The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3). The alleged illegal activity at issue here was neglect in the care of Ms. Harris in violation of the Tennessee Adult Protection Act. The TAPA defines "abuse and neglect" in the context of elder care as "the infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or obtain the services that are necessary to maintain that person's health or welfare." Tenn. Code Ann. § 71-6-102(1)(A).

In their motion for summary judgment, Defendants argued that Plaintiff failed to establish a prima facie case under the TPPA because he did not and could not establish that he refused to participate in or remain silent about "illegal activities" as defined by the statute. In support of their motion, Defendants' relied on Plaintiff's deposition testimony wherein Plaintiff acknowledged that the "neglect" at issue concerned an outdated bandage that was found on the ball of Ms. Harris' foot, although the wound was on her ankle. Defendants argued that because "the bandage was not found touching Ms. Harris'

---

to be applied in retaliatory discharge actions in the same way as in other cases, and rejected the federal *McDonnell Douglas* framework of allocations of burdens and order of presentation of proof of each party. *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 26 (Tenn. 2011). However, an amendment to Tenn. Code Ann. § 50-1-304, applicable to causes of action accruing on or after June 10, 2011, functionally overrules the retaliatory discharge summary judgment analysis of *Kinsler* and *Gossett. Williams*, 465 S.W.3d at 111 n.15 ("In 2011, the Legislature amended Section 50–1–304 to add a subsection (g), that set forth a statutory burden-shifting framework to be applied to all claims under the TPPA, both for summary judgment motions and for trial."). The cause of action in the instant case accrued in 2013; thus, the burden-shifting framework under the statute applies to Defendants' motion for summary judgment. *See* Andrée Sophia Blumstein, *Bye Bye Hannan? What A Difference Two Little Words, at Trial, Can Make in the Formulation of Tennessee's Summary Judgment Standard*, TENN. B.J., August 2011, at 17 (noting that after the amendment, in cases of retaliatory discharge courts will have to apply the federal burden-shifting standard of *McDonnell Douglas* at all stages of the case, including summary judgment).

[8] To establish the requisite causal relationship under the TPPA, a plaintiff must show that "his or her refusal to remain silent was the sole reason for the discharge." *Haynes v. Forman Stables, Inc.*, 483 S.W.3d 34, 37 (Tenn. 2015).

wound and there is no evidence that the bandage caused harm to Ms. Harris," the activities leading to Plaintiff's claim "in no way [rise] to the level of 'abuse and neglect' under [Tenn. Code Ann. § 71-6-102]." Generally stated, Defendants argued that this case arises from Plaintiff's "overreaction" to their being a small bandage on the bottom of a resident's foot, when the resident's wound, which was on her ankle, was properly dressed and bandaged.

Although he did not dispute the fact that the bandage was found on Ms. Harris' foot while her injury was located on her ankle, Plaintiff argued that the outdated bandage was evidence that the caretakers failed to sufficiently monitor and care for Ms. Harris and that this deprivation satisfies the statutory definition of neglect.

After reviewing the undisputed material facts, the trial court held that "leaving a bandage in a sock, where a patient's wound is in fact otherwise sufficiently bandaged is not illegal activity. . . [and] is not 'abuse and neglect' as defined in the statute." Based on this holding, the trial court summarily dismissed Plaintiff's TPPA claim.

On appeal, Plaintiff insists the trial court's holding was error because he is not required "to conclusively prove that the reported incident was illegal"; instead, he insists that "reasonable cause" for suspecting illegal activity is the standard. Further Plaintiff insists that summary judgment was not appropriate because "a disputed issue of fact remains about whether the reported incident of neglect meets the statutory definition of neglect," and "the question of whether the caretaker's misfeasance meets the statutory definition of neglect should have been left to the jury."

As Plaintiff correctly asserts, whether the alleged neglect of Ms. Harris constituted illegal activity as a matter of law is not dispositive of whether Plaintiff can establish a prima facie case of retaliatory discharge under the TPPA. As our Supreme Court has explained, "the [TPPA's] protection extends to employees who have *reasonable cause* to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it." *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997) (emphasis added).

We have discussed the "reasonable cause" requirement in several cases. In *Sanders v. Henry County*, an employee was terminated after he reported that his supervisor was "using the computer at his office to view personal, non-work-related emails containing what [the employee] considered to be inappropriate or pornographic pictures." *Sanders v. Henry County*, No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at *8 (Tenn. Ct. App. Apr. 21, 2009). When he sued his employer for retaliatory discharge, the trial court granted the employer's motion for summary judgment, finding that the supervisor's actions were not "illegal activities" within the meaning of the TPPA; thus, the employee was unable to establish that he reported or remained silent about an "illegal activity." *Id.* at *4. On appeal, the employee argued that regardless of the legality or illegality of his supervisor's actions, he could maintain a

- 8 -

claim under the TPPA so long as he reasonably believed that his supervisor's actions were illegal. In addressing this argument, we stated:

> Plaintiff does not claim that he was aware of any law, regulation, or rule which he believed [his supervisor] was violating. Plaintiff simply argues that "all that is required" is that he had a reasonable belief that the actions were "illegal." Plaintiff claims that he reported "what [he] perceived as illegal activities in the work place." He basically claims that he thought [his supervisor's] actions were wrong, and his brief attempts to support his assertion with a discussion of taxpayers' rights, cases dealing with pornography and obscenity, and a reference to [the city mayor's] statement that it is not "good practice" to view non-work-related material while working. However, we find that the Court's statement in *Mason* does not extend to the lengths urged by Plaintiff. Plaintiff did not establish the essential elements of his claim for statutory retaliatory discharge simply by claiming that he thought [his supervisor's] actions were wrong.

> As stated above, an employee has to meet a "formidable burden" in establishing this element of the whistleblower statute. *Hill*, 2001 WL 694479, at *5; *Darnall*, 1999 WL 346225, at *5. From our review of the cases applying the statute, an employee cannot meet this burden simply by claiming that he believed his employer's actions were "wrong" or against "public policy."

*Sanders*, 2009 WL 1065916, at *8-9. We then provided several examples to further illustrate what is required to establish "reasonable cause":

> In *Stein*, 945 S.W.2d at 716, the Supreme Court considered an employee's claim that she was wrongfully discharged "in violation of public policy.". . . The Court held that in order for the plaintiff-employee to prevail, he or she must point to a "clear mandate of public policy, evidenced by an unambiguous constitutional, statutory, or regulatory provision[.]" *Id.*

> In *Gager v. River Park Hospital*, No. M2007-02470-COA-R3-CV, 2009 WL 112544, at *1 (Tenn. Ct. App. Jan.14, 2009), a nurse practitioner sued her former employer, a hospital, for common law and statutory retaliatory discharge, claiming she was terminated as a result of her "refusal to remain silent" about an "illegal and ill-advised policy" implemented by the hospital regarding when nurses could call physicians. *Id.* at *1. Specifically, the nurse practitioner alleged that the hospital policy "served not only to endanger the health of patients but also [was] in contravention of Tennessee statutory, common and regulatory law and Tennessee's explicit public

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 50 of 56

policy." *Id*. at *4. The trial court granted summary judgment to the hospital, and the Court of Appeals affirmed, explaining:

> Ms. Gager has failed to identify the law and policy that she contends was contravened . . . or what activities of River Park were illegal; the quoted provisions from her affidavit reveal only a policy implemented by River Park with which Ms Gager disagreed. . . . [Allegations of illegal activity] must be substantiated to some degree. . . . Without more than mere assertions by Plaintiff, the claim must fail . . . .

In *Collins v. AmSouth Bank*, 241 S.W.3d at 881-82, a bank employee was fired after a heated argument with her supervisor about placing money in a night deposit drop box. The bank employee filed a suit for retaliatory discharge against the bank and claimed that she was unsure of whether her supervisor violated federal banking regulations and bank policy by instructing her to put the cash in the night deposit drop box. *Id.* at 882. The employee cited a federal statute and regulation as support for her belief that the supervisor's request was illegal. *Id.* at 885-86. However, on appeal, we found that the statute and regulation provided "no legal basis" for the employee's assertion that the supervisor's actions were illegal, and we affirmed summary judgment in favor of the bank. *Id.* at 886 n.4.

. . .

In several other statutory retaliatory discharge cases, we have affirmed summary judgment in favor of employers where employees were terminated after making complaints against their employers for activities that did not rise to the level of "illegal activities" under the statute. *See, e.g.*, *Bridgestone/Firestone, Inc. v. Orr*, No. M2006-2638-COA-R3-CV, 2008 WL 80200, at *4 (Tenn. Ct. App. W.S. Jan. 7, 2008) *perm. app. denied* (Tenn. Jun. 23, 2008) (finding that the employee's refusal to remain silent about tire failures did not involve illegal activities); *Forrest v. City of Ridgetop*, No. M2002-01176-COA-R3-CV, 2003 WL 21954195, at *6 (Tenn. Ct. App. Aug. 15, 2003) (stating that a police officer's complaints regarding his employer's practices such as "ticket fixing" did not constitute illegal activities within the meaning of the statute); *Robins v. Flagship Airlines, Inc.*, 956 S.W.2d 4, 6-7 (Tenn. Ct. App. 1997) (concluding that an airline employee's report to the company president regarding perceived problems with the maintenance department did "not even approach the subject of statutory or regulatory violations").

*Sanders*, 2009 WL 1065916, at *9-10.

Here, Plaintiff insists that he reasonably believed that Ms. Harris was neglected. However, as described above, to satisfy the standard set forth in *Mason*, Plaintiff must "identify the law and policy that [he] contends was contravened" and must be able to substantiate these allegations to some degree. *See Sanders*, 2009 WL 1065916, at *10 (quoting *River Park*, 2009 WL 112544, at *8).

To determine whether Plaintiff has met this burden, or whether a genuine issue exists which would preclude summary judgment, we must review the material facts. In this case, Ms. Harris, an elderly resident at Glen Oaks, had a persistent wound on her ankle that required daily monitoring at the facility as well as weekly treatment at the Wound Care Clinic. During a routine examination of the wound on her ankle on September 4, 2013, when an attendant at the Wound Care Clinic removed Ms. Harris' sock to examine the wound on the ankle, there was a bandage on the bottom of her foot that was dated "8/11/2013." At the conclusion of this routine visit, the old bandage was given to Richard Sanders, Ms. Harris' son, who drove his mother back to Glen Oaks. Upon arriving, Ms. Sanders, who was angry and visibly upset, met with Plaintiff to register a complaint concerning the old bandage being found on his mother's foot.

Although finding an old bandage on the bottom of Ms. Harris's foot was understandably disconcerting, we do not believe that such a discovery could reasonably lead to the conclusion that Ms. Harris was subject to elder neglect. We find it significant that the wound on her ankle was dressed appropriately on September 4 and the parties' respective statements of undisputed facts make no reference to any maladies or infirmities attributed to the old bandage being on the bottom of the foot of Ms. Harris. It is also significant that there is nothing in the statements of undisputed facts to indicate that the old bandage, which was dated "8/11/2013," or the same sock had been on the foot of Ms. Harris for the three weeks that had transpired since August 11.[9]

---

[9] Because the wound on the ankle was properly bandaged when Ms. Harris went to the Wound Care Clinic for her weekly visit on September 4, and all bandages on her ankle would have been removed and replaced on each of her weekly visits since August 11, the logical and reasonable inference to make is that the "8/11/15" bandage came off of her ankle during the following week but remained in the sock when the sock was removed. This is a reasonable inference because there is no evidence that Ms. Harris was not bathed properly between August 11 and September 4, which would have required removing the sock. In any event, a fresh bandage would have been placed on Ms. Harris' ankle during her next weekly visit to the clinic, which was on or about August 18, and on each weekly visit thereafter until she returned on September 4. Furthermore, we note that Plaintiff initially advanced the theory that the bandage was simply washed in Ms. Harris' sock and inadvertently placed back on her foot. Although these inferences are logical, the court is not permitted to draw an inference against the nonmoving party at the summary judgment stage. *See Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (We must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor).

Case 3:16-bk-03296   Doc 462-1   Filed 09/05/16   Entered 09/05/16 20:51:54   Desc
Exhibit Supreme Court Documents and Complaint   Page 52 of 56

Further, as was the case in *Sanders*, Plaintiff has failed to clearly identify the law and policy that he alleges was contravened and has not substantiated his allegations to a sufficient degree. *See Sanders*, 2009 WL 1065916, at *8-10. Like the employee in *Collins*, who filed suit for retaliatory discharge claiming that she was unsure of whether her supervisor violated federal bank regulations, Plaintiff acknowledges that he began his internal investigation unsure of whether there had been a violation of the Tennessee Adult Protection Act. Therefore, no reasonable jury could conclude that Plaintiff had reasonable cause to believe that these acts or omissions constituted illegal activities.

As described above, in an action for retaliatory discharge under the TPPA for refusing to participate in or remain silent about illegal activities, the plaintiff shall have the burden of establishing a prima facie case of retaliatory discharge. Tenn. Code Ann. § 50-1-304(f). If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. *Id.*

In this case, we have affirmed the trial court's holding that "leaving a bandage in a sock, where a patient's wound is in fact otherwise sufficiently bandaged, is not illegal activity as defined by the statute. Leaving the bandage in the sock is not 'abuse and neglect' as defined in the statute." We have also concluded that Plaintiff did not have reasonable cause to believe that Defendants' acts or omissions constituted illegal activities. Therefore, Plaintiff cannot establish the second essential factor in order to establish a prima facie case for retaliatory discharge under the TPPA. Because Plaintiff cannot establish the second essential factor of a TPPA retaliatory discharge claim, that he refused to participate in or remain silent about illegal activity, he failed to establish a prima facie case; thus, burden of persuasion never shifted and our inquiry concerning Plaintiff's TPPA claim ends here. Accordingly, summary dismissal of Plaintiff's TPPA claim was proper.[10]

## II. THE COMMON LAW CLAIM

Plaintiff also asserted a claim for relief under the Tennessee common law for retaliatory discharge. In *Chism v. Mid-South Milling Co., Inc.*, 762 S.W.2d 552 (Tenn. 1988), the Tennessee Supreme Court adopted a public policy exception to the employment-at-will doctrine "afford[ing] protection under the common law to employees

---

[10] Defendants asserted two additional grounds in their motion for summary judgment that the trial court did not address in its ruling. On appeal, Defendants state that we may affirm the dismissal of the TPPA claim on these grounds as well as the trial court's finding that the acts or omissions did not constitute illegal activities. Because we have affirmed the summary dismissal of the TPPA grounds for reasons stated in this opinion, it is not necessary for us to consider the additional grounds that were not considered by the trial court.

- 12 -

who refuse to participate in illegal activities or remain silent about them." *Williams*, 465 S.W.3d at 109 (citing *Chism*, 762 S.W.2d at 555-57).[11]

The essential elements of a common law retaliatory discharge claim are as follows: (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy. *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007).

These elements are similar to the requirements for a TPPA claim which, as noted earlier, are: (1) that the plaintiff was an employee of the defendant; (2) that he refused to participate in or remain silent about "illegal activities" as defined by the statute; (3) he was terminated; and (4) an exclusive causal relationship existed between his refusal to participate in or remain silent about illegal activities and his termination. *Franklin*, 210 S.W.3d at 528.

There are two important differences in the two claims, however, which may or may not be significant depending on the facts at issue. Under the TPPA, the plaintiff must establish that he refused to participate in or remain silent about "*illegal activities*" as defined by the statute common law, *see* Tenn. Code Ann. § 50-1-304(b), while under the common law the plaintiff must establish that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision. *See Collins*, 241 S.W.3d at 884. The other difference between the common law and statutory retaliatory discharge claims is whether the employee's refusal was the sole reason or merely a substantial factor in his or her discharge. "[T]o benefit from statutory protection, an employee must demonstrate that his or her refusal was the sole reason for his or her discharge." *Collins*, 241 S.W.3d at 844; *see also Haynes v.*

---

[11] Two years later, the General Assembly enacted the TPPA which "essentially codified the common-law cause of action for retaliatory discharge articulated in *Chism*." *Williams*, 465 S.W.3d at 109-10. However,

> "[e]ffective July 1, 2014, the TPPA was amended to specifically 'abrogate[ ] and supersede[ ] the common law with respect to any claim that could have been brought under this section.' Tenn. Code Ann. § 50-1-304(g) (2014). Accordingly, under the statute as amended in 2014, in cases in which the plaintiff alleges retaliatory discharge for refusing to participate in illegal activities or for refusing to remain silent about illegal activities, the TPPA is the exclusive basis for relief."

*Williams*, 465 S.W.3d at 109 n.11. This case accrued prior to July 1, 2014; thus the common law retaliatory discharge claim is still viable.

- 13 -

*Forman Stables, Inc.*, 483 S.W.3d 34, 37 (Tenn. 2015). On the other hand, a plaintiff asserting a common law retaliatory discharge claim need only show that the protected action was a substantial factor in the employer's decision. *Williams*, 465 S.W.3d at 111; *see also Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 28 (Tenn. 2011) ("[T]he legislature has chosen to enact a stringent standard . . . for recovery under a retaliatory discharge claim pursuant to the [TPPA].").

Accordingly, we now consider whether Plaintiff has established, or for purposes of summary judgment created a dispute of fact, that a substantial reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision, as distinguished from whether he reasonably believed that the acts or omissions he reported were "illegal activities."

Without question, the abuse or neglect of an elder adult violates the public policy of Tennessee. This public policy is embodied by the Tennessee Adult Protection Act. *See* Tenn. Code Ann. § 71-6-101(b)(1) ("The purpose of this part is to protect adults coming within this part from abuse, neglect, or exploitation by requiring reporting of suspected cases by any person having cause to believe that such cases exist."). However, we have already concluded that the acts or omissions reported by Plaintiff could not reasonably be believed to constitute abuse or neglect under TAPA. *See* Tenn. Code Ann. § 71-6-102 (defining "abuse and neglect" in the context of elder care as "the infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or obtain the services that are necessary to maintain that person's health or welfare."). Thus, we similarly conclude that the acts reported by Plaintiff could not reasonably be believed to constitute a violation of Tennessee public policy. Accordingly, the trial court correctly held that "[Defendant] is not shown to have been engaged in illegal conduct or in any way to have posed a threat to an important public policy of the State when all that was done was to leave an old bandage in a patient's sock."

The foregoing notwithstanding, Plaintiff insists that he is entitled to the protection afforded under the common law because he believed he was under a mandatory statutory duty to report the incident. We respectfully disagree with this assertion because a condition precedent to the duty to report is that *one must have reasonable cause to suspect that an adult has suffered abuse, neglect, or exploitation.*[12] *See* Tenn. Code Ann. § 71-6-103(b)(1). The statute does not require the reporting of an act or omission that

---

[12] The TAPA states, in pertinent part: "Any person, including, but not limited to, a physician, nurse, social worker, department personnel, coroner, medical examiner, alternate care facility employee, or caretaker, having *reasonable cause to suspect that an adult has suffered abuse, neglect, or exploitation*, shall report or cause reports to be made in accordance with this part." Tenn. Code Ann. § 71-6-103(b)(1) (emphasis added).

- 14 -

does not violate a clear public policy or statutory or regulatory provision. Therefore, because no reasonable person could believe that these acts or omissions violate a public policy, the reporting of these acts does not afford Plaintiff the remedies available under Tenn. Code Ann. § 71-6-103 or the common law. Accordingly, summary dismissal of Plaintiff's common law claim was appropriate.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Daniel Richmond.

FRANK G. CLEMENT, JR., JUDGE

- 15 -